YEE v SHIAWASSEE COUNTY BOARD OF COMMISSIONERS
YEE v BRAIDWOOD
YEE v CUMMINGS

Docket Nos. 226612, 226613, 226614. Submitted March 11, 2002, at Detroit.
Decided May 21, 2002, at 9:05 A M. Leave to appeal sought.

William R. Yee brought an action in the Shiawassee Circuit Court
against Forrest Cummings and others, alleging that the defendants
were operating the spillway of a dam on an artificially created lake
in a manner calculated to maintain the lake's level in excess of that
provided in a dam construction permit granted to Cummings by the
Department of Conservation, now the Department of Environmen-
tal Quality. The plaintiff sought damages for trespass caused by the
submergence of part of his lakefront lot and heaving and cracking
of the basement of his house from increased hydrostatic pressure.
The plaintiff also sought an injunction requiring the defendants to
reduce the level of the lake to that provided in the permit. The
State Court Administrative Office assigned the matter to the Gene-
see Circuit Court, Judith A. Fullerton, J., after a recusal by the
Shiawassee Circuit Court, Gerald Lostracco, J. On motion by the
defendants, the Genesee Circuit Court bifurcated the trial to sepa-
rate the issue of damages from the issue of lake level. The issue of
damages was then submitted to mediation. The mediation clerk
issued notice advising that all parties had accepted a mediation
evaluation in favor of the plaintiff. Cummings died at this stage of
the proceedings, and the court granted summary disposition for the
defendants, ruling that the dam construction permit did not estab-
lish a normal lake level; that even if the permit had done so, there
was no one against whom to enforce the level in light of the death
of the permit holder; that the determination of a lake level for pur-
poses of assessing liability for damages was moot in light of the
acceptance of the mediation evaluation; and that it had no jurisdic-
tion to determine and impose a normal lake level in the absence of
an action pursuant to Part 307 of the Natural Resources and Envi-
ronmental Protection Act (NREPA), MCL 324.30701 *et seq.*, by the
Shiawassee County Board of Commissioners. The court allowed
the parties to file judgments pursuant to their acceptances of the
mediation evaluation. The defendants prepared such judgments and
tendered their payment to the county clerk when the plaintiff

refused to accept the payments. The county clerk thereafter issued satisfactions of judgment. The plaintiff appealed (Docket No. 226614).

The plaintiff also filed an action in the Shiawassee Circuit Court against the Shiawassee County Board of Commissioners, the Shiawassee County Drain Commissioner, and one of the defendants in the first action, seeking an injunction preventing the board from pursuing an action for setting the legal lake level, a declaration that the legal lake level is that provided in the dam construction permit, damages for trespass, and an injunction abating flooding. The plaintiff filed a third action in the Shiawassee Circuit Court, this action being against his neighbors and repeating the claims he raised in the first and second actions. The State Court Administrative Office assigned the second and third actions to the Genesee Circuit Court, Judith A. Fullerton, J., after a recusal by the Shiawassee Circuit Court, Gerald Lostracco, J. The Genesee Circuit Court granted summary disposition for the defendants in the second and third actions, ruling that an injunction against the county board of commissioners and the drain commissioner was premature and that the claims against the other defendants were barred by res judicata. The plaintiff filed a motion for relief from judgment in the first action, seeking to be allowed to substitute a representative for the deceased defendant Cummings and add any other party necessary to allow the action to continue. The plaintiff argued that the defendants had perpetrated a fraud on the court by representing that the action could not continue upon Cummings' death. The plaintiff further argued that he was denied due process when summary disposition was granted, because the notice requirements of MCR 2.116 were not met. The court denied the motion for relief from judgment. The plaintiff appealed from the orders that disposed of the second and third actions (Docket Nos. 226612 and 226613, respectively). The separate appeals from the three actions were consolidated by the Court of Appeals.

The Court of Appeals held:

1. Despite the noncompliance of the defendants in the first action with the notice requirements of MCR 2.116(G) for the filing and service of their motion for summary disposition, summary disposition was properly granted for the defendants on the basis of the trial court's lack of subject-matter jurisdiction. By enacting the procedures outlined in Part 307 of the NREPA and its predecessor, the Inland Lake Level Act, MCL 281.61 et seq., the Legislature clearly limited the circuit court's power to determine normal lake levels to those actions initiated by county boards of commissioners in accordance with the NREPA. In view of the trial court's lack of

subject-matter jurisdiction, no prejudice to the plaintiff resulted from the defendants' untimely filing of their motions for summary disposition and any resulting error was harmless.

2. The death of defendant Cummings did not abate the actions with respect to that defendant or affect the court's ability to act with respect to the other defendants. The death of a party during the pendency of an action neither abates the suit nor deprives a court of jurisdiction over the matter. MCL 600.2921 states that all actions and claims survive death, and MCR 2.202(A)(1) permits a court to allow substitution of parties if a party dies and the claim at issue is not thereby extinguished.

3. The plaintiff is not entitled to have the judgments entered on the mediation awards set aside on the ground of fraud. Despite the plaintiff's claim that his acceptance of mediated damages was premised on a belief that a determination of the legal lake level would follow, there is nothing in the record to suggest that his acceptance was contingent on some future event or decision. In any event, because the Shiawassee County Board of Commissioners has since initiated an action to determine the lake level pursuant to Part 307 of the NREPA, the plaintiff will ultimately receive the judicial determination he claims to have contemplated at the time he accepted the mediation awards.

4. The trial court did not err in denying the plaintiff's motion for relief from judgment in the first action without first conducting an evidentiary hearing concerning the plaintiff's allegation of fraud. The plaintiff failed to offer significant, specific allegations of fraud on the part of the defendants. In any event, even assuming that the trial court erred in failing to conduct an evidentiary hearing, the error was harmless because dismissal of the action was required for lack of subject-matter jurisdiction.

5. Any error by the trial court in dismissing the second and third actions on the basis of res judicata was rendered harmless because summary disposition was required for lack of subject-matter jurisdiction.

6. The trial court did not err in awarding attorney fees and costs to the defendants pursuant to MCR 2.625 and 2.114(E) after finding that the plaintiff's actions were frivolous, i.e., devoid of arguable legal merit.

Affirmed.

Waters and Watercourses — Inland Lake Levels — Natural Resources and Environmental Protection Act — Circuit Court — Subject-Matter Jurisdiction.

The circuit court has subject-matter jurisdiction over actions seeking the setting of normal levels of inland lakes; such actions must be initiated by county boards of commissioners pursuant to Part 307 of the Natural Resources and Environmental Protection Act (MCL 324.30701 *et seq.*).

*William R. Yee*, in propria persona.

*Johnson, Rosati, LaBarge, Aseltyne & Field, P.C.* (by *Jason D. Kolkema*), for Shiawasee County Board of Commissioners and Shiawasee County Drain Commissioner.

*Thomas A. Connolly, P.C.* (by *Thomas A. Connolly*), for George Braidwood, II, and Cynthia Braidwood.

*Bigler, Berry, Johnston, Sztykiel & Hunt, P.C.* (by *J. Steven Johnston* and *Eric S. Goldstein*), for Bryan and Kelly Jackson.

*Harvey Kruse, P.C.* (by *Alan R. Sullivan*), for George Braidwood and others.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *James T. Farrell*, Assistant Attorney General, for Department of State Police.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *S. Peter Manning*, Assistant Attorney General, for Director of Department of Environmental Quality and Director of Department of Natural Resources.

*David Carbajal*, for Norma Power and others.

*Gault Davison, P.C.* (by *Edward B. Davison*), for Donald G. Cummings and others.

*Steven P. Iamarino*, for Eric and Melody King.

Before: SAAD, P.J., and BANDSTRA and SMOLENSKI, JJ.

BANDSTRA, J. In these consolidated cases, plaintiff appeals the trial court's orders granting summary disposition in favor of defendants. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

These matters arise from a dispute regarding the water level of Bambi Lake,[1] an impoundment of water created following the construction of a dam along a branch of Spring Hollow Creek in southern Shiawassee County. The dam was constructed in the early 1970s by defendant Forrest Cummings, pursuant to a permit issued by the state department of conservation.[2] After formation of the lake, Cummings sold off parcels fronting the water to several of the named defendants in these actions or their predecessors in interest. Plaintiff purchased one such lot, with an existing residence, in 1986. According to plaintiff, at the time he purchased the home its basement "was in good repair," with "no evidence of dampness, leakage, or other significant damage to the basement floor." Beginning in 1994, however, the floor of plaintiff's basement began to "heave and crack" as a result of

---

[1] Bambi Lake is also known as Cummings Lake.

[2] The Michigan Department of Conservation and its successor, the Department of Natural Resources (DNR), were responsible for issuing such permits until October 1995, when the powers of the Land and Water Management Division of the DNR, including those respecting the construction and maintenance of dams, were transferred to the newly created Department of Environmental Quality. See MCL 324.99903.

increased hydrostatic pressure beneath the home prompted by a rise in the lake's water level, which is controlled by a spillway located at the southwest end of the lake.[3] According to plaintiff, from 1970 to 1993 the lake's water level had been consistently maintained at 799 feet above sea level, the "crest elevation" cited in the dam permit awarded Cummings in 1970. However, beginning in 1994, the lake's water level began to rise, resulting in the encroachment of lake water onto portions of plaintiff's property that were previously dry and in damage to trees and other vegetation on his property. To alleviate these problems, as well as the resulting damage to his home, plaintiff removed the top spillway stop log in order to lower the lake's level to its previous elevation of 799 feet. Shortly thereafter, however, owners of property surrounding the lake replaced the stop log and placed a pad lock on the spillway, thereby setting the lake's level at a permanent elevation of approximately 800.95 feet above sea level.

In August 1995, plaintiff filed suit (Docket No. 226614) alleging that defendants had conspired to operate the spillway in a manner calculated to maintain Bambi Lake at a level detrimental to his property.[4] Plaintiff sought relief in the form of monetary damages for trespass and additionally requested that the trial court issue an injunction requiring the defendant property owners to reduce the lake's level to a

---

[3] Stop logs installed at the mouth of the spillway can be added or removed to raise or lower the lake's water level.

[4] Shiawassee Circuit Judge Gerald Lostracco recused himself in that matter, and supervision of the case was assigned by the State Court Administrative Office to Judge Judith A. Fullerton in the Genesee Circuit Court.

crest elevation of 799 feet above sea level, in accordance with the 1970 dam permit.

In February and June 1998, defendants moved to bifurcate trial of plaintiff's claims in the interest of judicial economy, arguing that the damages issue would not need to be decided unless it was first determined that the lake was being maintained at an inappropriate level. The trial court agreed and, in July 1998, entered an order bifurcating the lake level issue from that of damages. The portion of the case pertaining to monetary damages was nevertheless submitted to mediation in November 1998, pursuant to MCR 2.403, with trial on the lake level issue scheduled to take place before the bench on January 20, 1999. On January 7, 1999, the mediation clerk issued notice advising that all parties had accepted the mediation evaluation in favor of the plaintiff. The following week the trial court was informed that defendant Forrest Cummings had died on January 8, 1999.

On January 18, 1999, issues concerning the trial court's authority to establish a legal lake level were raised in a trial brief submitted by intervening plaintiff Michigan Department of Environmental Quality (DEQ).[5] In its brief, the DEQ argued that, contrary to plaintiff's position, the dam permit awarded to Forrest Cummings in April 1970 under the former dam construction approval act[6] did not establish an enforceable lake level, because establishment of a

---

[5] The DEQ was permitted to intervene in the lawsuit on the basis that establishment of an "appropriate" water level for Bambi Lake could potentially require modifications to Cummings Dam, which, as the relevant permitting authority, required DEQ involvement. See MCL 324.31509; see also n 2, *supra.*

[6] MCL 281.131 *et seq.*, repealed by 1989 PA 300, § 65. See also n 21, *infra.*

legal lake level was outside the scope of the act.
Rather, the department argued, the exclusive method
for establishing a legal lake level is through the proce-
dures outlined under Part 307 of the Natural
Resources and Environmental Protection Act
(NREPA).[7] Because those procedures had not been fol-
lowed, the department argued, the trial court had no
authority to act in the manner requested by plaintiff.
The department further argued that, even if the 1970
dam permit could be found to have established an
enforceable lake level, because Cummings was now
deceased, there was no one left against whom the
trial court could enforce the permit requirements.
Accordingly, the DEQ requested that the matter be
dismissed.

Several defendants adopted the arguments of the
DEQ in motions for summary disposition filed on
January 19, 1999. On January 20, 1999, the parties
assembled for trial on the lake level issue. Before
trial, however, the court heard argument on the
issues raised by the DEQ in its trial brief. After hearing
the arguments of all parties, the court determined
that summary disposition of plaintiff's claims was
appropriate. In doing so, the trial court ruled (1) that
the 1970 dam construction permit did not establish a
legal lake level, (2) that even if the permit had oper-
ated as such, the permittee had passed away and thus
there was no one against whom to enforce such a

---

[7] MCL 324.30701 *et seq.* The statutes governing establishment of "nor-
mal," or legal, lake levels were included in the Inland Lake Level Act, MCL
281.61 to 281.86, until they were repealed by 1994 PA 451, § 90103, and
reenacted as Part 307 of the NREPA by 1995 PA 59, § 1, without substantive
change. As will be explained, Part 307 requires that any action to establish
a legal level for an inland lake be initiated by the county board of commis-
sioners. See MCL 324.30702.

level, (3) that the determination of a lake level for purposes of assessing damages liability was moot in light of mediation acceptance, and (4) that it had no jurisdiction to determine and impose a legal lake level in the absence of an action filed pursuant to Part 307 of the NREPA. The trial court further suggested that if the parties wished to establish a legal lake level, they should petition the Shiawassee County Board of Commissioners to do so "as soon as possible."

An order granting summary disposition under MCR 2.116(C)(4), lack of subject-matter jurisdiction, and MCR 2.116(C)(8), failure to state a claim on which relief could be granted, was entered in favor of all defendants on February 3, 1999. The order expressly provided that the parties could file judgments pursuant to mediation acceptance following entry of that order. Counsel for the various parties prepared judgments pursuant to MCR 2.403(M), the last of which was entered on February 18, 1999. Plaintiff, however, apparently refused to accept the judgment proceeds or to sign a satisfaction of judgment, and thus each of the defendants was required to pay the judgment proceeds to the county clerk, who issued the necessary satisfactions of judgment.

Several days after dismissal of plaintiff's suit, those defendants who were riparian owners on Bambi Lake petitioned the Shiawassee County Board of Commissioners to establish a normal lake level for Bambi Lake under Part 307 of the NREPA. Acting on this petition, the Shiawassee County Board of Commissioners, on April 15, 1999, directed that an engineering study be conducted in order to determine the historic water surface elevation of the lake. Upon completion of this study in April 2000, the board directed the county

attorney to commence an action in the Shiawassee Circuit Court "to set the water surface elevation level at Bambi Lake at 800.67 feet." The county attorney initiated such action on June 13, 2000. According to the parties, that matter is currently pending in the Shiawassee Circuit Court.

On August 6, 1999, plaintiff filed a second action (Docket No. 226612), naming the Shiawassee County Board of Commissioners, the Shiawassee County Drain Commissioner, and George Braidwood, Jr., as defendants.[8] The first amended complaint, under which this action was litigated, sought to enjoin the county commissioners from setting a legal water level for Bambi Lake. In bringing this action, plaintiff asserted that the issue of the lake level was properly before the trial court in the 1995 action and that the dam permit set the legal lake level at 799 feet above sea level, and demanded that the trial court issue an order declaring that the legal lake level had been set at 799 feet above sea level. Plaintiff further sought damages for the flooding of his property, as well as an injunction "to abate the flooding."

On November 22, 1999, plaintiff filed a third action relating to the water level of Bambi Lake (Docket No. 226613).[9] Although filed as a claim to quiet title and determine interests in land, the relief sought by plaintiff was in essence the same as that sought in the previous two actions, i.e., an order declaring that the "lawful normal" elevation of Bambi Lake, as established by the 1970 dam permit, was 799 feet above

---

[8] Judge Lostracco again recused himself and the matter was transferred to the Genesee Circuit Court. See n 4, *supra*.

[9] See n 8, *supra*.

sea level, and that no county agency had authority to alter that level.

Each of the defendants in the second case, and a majority of those in the third, moved for summary disposition under various theories, including res judicata stemming from the trial court's previous ruling that the 1970 dam permit did not establish a legal lake level and plaintiff's acceptance of mediation regarding any damages related to the flooding of his property. The county defendants further argued that summary disposition of plaintiff's request to enjoin the board of commissioners from seeking to establish a legal lake level under Part 307 of the NREPA was appropriate, because the board had not yet filed the requisite petition in the circuit court seeking to do so and, therefore, there was no basis for an injunction at that time.[10] At a hearing on these motions, plaintiff argued that because the issue of the lake level was not decided in the previous action, res judicata did not apply to bar his subsequent suits. Plaintiff further argued that, because Bambi Lake is a private lake rather than a public lake, the Shiawassee County Board of Commissioners did not have authority to seek establishment of a legal lake level for Bambi Lake and that it therefore did not matter that the board had not yet filed a petition in the circuit court seeking to do so. The trial court disagreed, finding that an injunction against the county commissioners was premature and that plaintiff had nonetheless failed to meet the requirements for injunctive relief. Accordingly, the trial court dismissed plaintiff's

---

[10] The board's petition seeking to set a legal lake level for Bambi Lake was not filed until June 13, 2000.

request for injunctive relief under MCR 2.116(C)(8). The trial court further found that, in light of its previous ruling that the 1970 dam permit did not establish a legal lake level, as well as plaintiff's acceptance of mediation, any subsequent claims for damages or equitable relief based on the elevations cited in that permit were barred by res judicata and thus summary disposition under MCR 2.116(C)(7) was appropriate.

In September 1999, plaintiff attempted to revive the litigation in Docket No. 226614 by filing a motion for postjudgment relief requesting that the trial court reverse its order granting defendants summary disposition and allow plaintiff to substitute a representative for the deceased Forrest Cummings and add any other party necessary to allow that action to continue. Plaintiff asserted that he was entitled to such relief under MCR 2.612(C), because the defendants had perpetrated a fraud on the court by representing that the action could not continue upon Cummings' death despite the right to substitute a representative party provided for under MCR 2.202 and MCR 2.207. Plaintiff further argued that he was denied due process because MCR 2.116(B)(2) does not permit a hearing on a motion for summary disposition until twenty-eight days after service of the pleadings on the nonmoving party. After hearing argument from the parties, the trial court denied the motion, finding no fraud to have occurred. Plaintiff subsequently sought reconsideration of the motion, which was ultimately denied.

While reconsideration was pending in the trial court, plaintiff filed a claim of appeal in each of these three cases. This Court consolidated the appeals and

ordered that plaintiff's claims be treated as if on leave granted.[11]

### A. SUMMARY DISPOSITION

In Docket No. 226614, plaintiff first argues that the trial court's granting of summary disposition to defendants was error because defendants did not comply with the notice requirements of MCR 2.116(B)(2), thereby denying him due process. Although we agree that defendants violated the notice requirements provided under the court rules, we find that summary disposition of plaintiff's suit was nonetheless proper.

Initially, we note that the court rule relied on by plaintiff in asserting a lack of sufficient notice does not apply to the facts of this case. MCR 2.116(B)(2) provides:

> A motion under this rule may be filed at any time consistent with subrule (D) and subrule (G)(1), but the hearing on the motion *brought by a party asserting a claim* shall not take place until at least 28 days after the opposing party was served with the pleading stating the claim.[12]

As noted by this Court in *Smith v Sinai Hosp of Detroit*,[13] "MCR 2.116(B)(2) does not apply to defendants who wish to move for summary disposition," but rather "governs plaintiffs who wish to move for immediate summary disposition upon the filing of a

---

[11] See MCR 7.203(B). Given the interrelation of his arguments, we have also consolidated several of plaintiff's issues on appeal.

[12] Emphasis added.

[13] *Smith v Sinai Hosp of Detroit*, 152 Mich App 716, 723; 394 NW2d 82 (1986).

complaint, hence the words 'a party asserting a claim' in MCR 2.116(B)(2)." Nevertheless, plaintiff is correct that defendants' motions for summary disposition were not timely filed. Under MCR 2.116(G), a written motion for summary disposition, along with a supporting brief and any affidavits or other documentary evidence, must be filed and served at least twenty-one days before the date set for hearing on the motion.[14] Although the trial court may set a different time for filing and service of such a motion, any such authorization must be either endorsed in writing on the face of the notice of hearing or made by separate order.[15] Here, it is not disputed that the motions on which the trial court granted summary disposition were heard on the day of trial, after being filed and served the previous day without the written imprimatur of the trial court. However, as explained below, summary disposition was proper despite this procedural deficiency.[16]

As previously noted, before dismissal of plaintiff's suit all parties accepted mediation with respect to the damages claimed by plaintiff to have resulted from the flooding of his property. Thus, the only issue left to be resolved at trial was that concerning the appro-

---

[14] MCR 2.116(G)(1)(a)(i).

[15] MCR 2.116(G)(1)(b).

[16] Contrary to defendants' assertions, MCR 2.116(D)(3) does not relieve them of the obligation to file and serve a motion for summary disposition premised on a lack of subject-matter jurisdiction within the period prescribed by MCR 2.116(G)(1)(a)(i). Although MCR 2.116(D)(3) provides that such grounds for summary disposition may be "raised at any time," the rule merely serves to remove any time limit for asserting those grounds as a basis for summary disposition. See Michigan Court Rules Practice, Rule 2116.5, p 366.

priate level of the waters of Bambi Lake.[17] The trial court, however, concluded that it was without jurisdiction to reach a determination on that issue and granted summary disposition under, among other subsections, MCR 2.116(C)(4). In reaching this conclusion the trial court found that, contrary to plaintiff's assertion, the water levels and impoundment surface areas cited in the 1970 dam construction permit did not establish an enforceable legal lake level and that any proceeding to set such a level must be initiated under Part 307 of the NREPA. After review of the relevant statutes, we agree that the trial court lacked jurisdiction to render the requested relief.

"Jurisdictional questions under MCR 2.116(C)(4) are questions of law that are . . . reviewed de novo."[18] Statutory interpretation is similarly a question of law that is reviewed de novo on appeal.[19] The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature, and the first criterion in determining such intent is the specific language of the statute.[20]

---

[17] We note that in *Cam Constr v Lake Edgewood Condominium Ass'n*, 465 Mich 549, 557; 640 NW2d 256 (2002), our Supreme Court recently held that parties may no longer "except claims from case evaluation under [MCR 2.403]." "If all parties accept the panel's evaluation, the case is over," and a party may not, therefore, appeal from an adverse summary disposition on any one count in the action. *Cam Constr, supra* at 550; see also MCR 2.403(M)(1). However, because the question is not directly before us, we express no opinion on the applicability of *Cam Constr* to this matter.

[18] *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205; 631 NW2d 733 (2001).

[19] *Oakland Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998); *Ypsilanti Housing Comm v O'Day*, 240 Mich App 621, 624; 618 NW2d 18 (2000).

[20] *Housing Comm, supra* at 624.

The 1970 dam construction permit at issue here was issued under the provisions of the now repealed dam construction approval act (DCAA).[21] The preamble to 1963 PA 184, which established the DCAA, states, in relevant part, that the purpose of the act was "to require the obtaining of approval by the department of conservation before erection of dams in streams or rivers . . . ." To effectuate this purpose, the act permitted the department to require permit applicants to submit "detailed plans" of the proposed construction and provide those funds estimated to be necessary "to cover the actual cost of making an engineering study of the plans submitted and of making inspection [of the dam] during and after construction."[22] The act further authorized the department to promulgate rules "governing [the] standards and methods of construction and materials used so as to insure the structural soundness of any dam," and to "cancel any permit issued by it upon failure to comply" with those standards.[23] Given this language, it is clear that the provisions of the act were intended simply to provide for a method of regulating the construction of dams in this state in order to ensure their structural integrity. Although this goal would necessarily require consideration and approval of proposed impoundment surface areas and levels, nothing in the act indicates that these were intended to establish an enforceable lake level. To the contrary, that a construction permit issued under the DCAA was not intended to establish

[21] MCL 281.131 *et seq.* The DCAA was repealed by 1989 PA 300, § 65 and recodified as the Dam Safety Act, MCL 281.1301 *et seq.*, which was itself repealed by 1994 PA 451, § 90103 and reenacted by 1995 PA 59, § 1 as Part 315 of the NREPA.

[22] 1963 PA 184, § 2.

[23] *Id.* at § 3.

an enforceable lake level is clearly indicated by the Legislature's amendment of the DCAA in July 1970 (just three months after issuance of the Cummings permit) to require successful permit applicants to petition for the establishment of a legal lake level under the Inland Lake Level Act of 1961 (ILLA):[24]

> Prior to 60 days following construction of any impoundment created by a dam authorized by this act with a head of 5 feet or over, or impounding 5 or more acres,[25] the permittee, subject to the provisions of [the ILLA], shall petition the county board of supervisors for a court-established lake level and establishment of a special assessment district for future maintenance of the lake level. The permittee shall record the court order establishing the lake level with the register of deeds, and advise the department of natural resources in writing of such compliance.[26]

Although this section was repealed by 1989 PA 300, and not replaced when the remainder of the DCAA was recodified as the Dam Safety Act,[27] if, as plaintiff asserts, permits issued under the DCAA were intended by the Legislature to establish an enforceable lake level, this amendatory provision would have been wholly unnecessary. Such an interpretation is contrary to the rules of statutory construction.[28] Moreover, even excepting this amendment of the DCAA, the fact that the Legislature has, since 1911, provided a

---

[24] MCL 281.61 *et seq.*, repealed by 1994 PA 451, § 90103. See n 7, *supra*.

[25] The waters of Bambi Lake cover approximately twenty-seven acres.

[26] See 1970 PA 68, § 2a.

[27] MCL 281.1301 *et seq.*, repealed by 1994 PA 451, § 90103. See n 21, *supra*.

[28] See *Hoste v Shanty Creek Management, Inc*, 459 Mich 561, 574; 592 NW2d 360 (1999) (when interpreting a statute, courts should avoid any construction that would render any part of a statute surplusage or nugatory).

separate comprehensive statutory scheme for the establishment of inland lake levels strongly militates against any claim that issuance of a construction permit under the DCAA was intended to establish a legally enforceable lake level.[29]

Statutes that relate to the same subject matter or share a common purpose are in pari materia and must be read together as one law.[30] In Michigan, there has been a statutory vehicle for the establishment of a legal lake level, in a form substantially unchanged through today, since the enactment of 1911 PA 202. The modern version of this statutory scheme, the ILLA, was enacted in 1961 "to provide for the determination and maintenance of the normal height and level of the waters in inland lakes of this state, for the protection of the public health, safety and welfare and the conservation of the natural resources of this state."[31]

After its enactment, the ILLA underwent only minor revisions until 1995, when it was substantially reorganized and recodified as Part 307 of the NREPA.[32] However, despite this extensive reorganization, the substance of the act remains as it was under the ILLA. The procedures for initiating an action to establish the "normal level" of an inland lake are currently outlined in §§ 30702-30704 of the NREPA.[33] Subsection 30702(1)[34] provides:

> The county board of a county in which an inland lake is located may upon the board's own motion, or shall within

---

[29] See 1911 PA 202.

[30] *State Treasurer v Schuster*, 456 Mich 408, 417; 572 NW2d 628 (1998).

[31] 1961 PA 146, preamble.

[32] See n 7, *supra*.

[33] MCL 324.30702-324.30704.

[34] MCL 324.30702(1).

45 days following receipt of a petition to the board of ⅔ of the owners of lands abutting the inland lake, initiate action to take the necessary steps to cause to be determined the normal level of the inland lake.[35]

Subsection 30703(1)[36] authorizes the county board to commission a preliminary engineering study to determine the necessity and feasibility of establishing such normal level. As did its predecessor, Part 307 further provides that

[i]f the county board, based on the preliminary study, finds it expedient to have and resolves to have determined and established the normal level of an inland lake, the county board shall direct the prosecuting attorney or other legal counsel of the county to initiate a proceeding by proper petition in the court of that county for determination of the normal level for that inland lake and for establishing a special assessment district if the county board determines that one is necessary . . . .[37]

Section 30707 requires extended publication of notice before any hearing on the matter[38] and sets forth a number of factors that the court must consider when determining the normal height and level of the waters in inland lakes, including the historical lake level and any testimony or evidence offered by "interested persons."[39]

Although nothing in Part 307 specifically excludes initiation of such proceedings by an individual so

---

[35] Under MCL 324.30706, the DEQ is similarly vested with authority to initiate "proceedings for determination of the normal level." See ns 2 and 5, *supra*.

[36] MCL 324.30703(1).

[37] MCL 324.30704(1).

[38] MCL 324.30707(1).

[39] See MCL 324.30707(4).

interested, we conclude that, by enacting such a comprehensive scheme for the establishment and maintenance of legal lake levels, the Legislature has signified its intent to vest authority to initiate such a proceeding solely within the county board of commissioners or its delegated authority. Accordingly, without such action by these public authorities, a circuit court is powerless to act.

It is fundamental that the classes of cases over which the circuit courts have subject-matter jurisdiction are defined by this state's constitution and Legislature.[40] By enacting the procedures outlined in Part 307 of the NREPA and its predecessor, the ILLA, the Legislature clearly limited the court's power to determine legal lake levels to those actions initiated by the county commissioners in accordance with the act.[41]

That the Legislature intended these proceedings to be initiated as a matter of public rather than private action is further supported by the public purpose of the statute.[42] As recognized by this Court in *In re Van Ettan Lake*:[43]

> The purpose of the [ILLA] is to provide for the control and maintenance of inland lake levels for the benefit and welfare of the public. Read as a whole, the act essentially authorizes *counties* to make policy decisions as to the levels of their inland lakes, and build and finance dams as necessary to maintain the desired levels. *It cannot be rea-*

---

[40] MCL 600.605.

[41] Once such a determination has been made, however, circuit court jurisdiction over a lake's level continues. MCL 324.30707(5); see also *Anson v Barry Co Drain Comm'r*, 210 Mich App 322, 325-326; 533 NW2d 19 (1995).

[42] That Part 307 similarly permits the DEQ to initiate such proceedings is consistent with the public purpose of the act. See n 35, *supra*.

[43] *In re Van Ettan Lake*, 149 Mich App 517; 386 NW2d 572 (1986).

*sonably argued that the purpose of the act is to also create or protect individual rights as to inland lake levels. The focus of the act is clearly on the public welfare and not on individual riparian rights.*[44]

Because a court is continually obliged to question sua sponte its own jurisdiction over a person, the subject matter of an action, or the limits of the relief it may afford,[45] it was the trial court's duty to take notice of its lack of subject-matter jurisdiction and dismiss plaintiff's claim for injunctive relief pursuant to MCR 2.116(C)(4).[46] Indeed, want of subject-matter jurisdiction is so serious a defect in the proceedings that the trial court was duty-bound to dismiss plaintiff's suit even had defendants not so requested.[47] Accordingly, no prejudice to plaintiff resulted from defendants' untimely filing of their motions for summary disposition and any error was harmless.[48]

In reaching this conclusion, we recognize that a panel of this Court previously considered the statutory language now found in MCL 324.30702(1) and concluded that, by providing that the county "may"— as opposed to "shall"—seek to initiate proceedings to determine the normal level of an inland lake, the Legislature did not foreclose a private cause of action for

---

[44] *Id.* at 525-526 (citations omitted, emphasis added). See also *Wortelboer v Benzie Co*, 212 Mich App 208, 214; 537 NW2d 603 (1995) (although plaintiff riparian owners were "interested persons" within the meaning of the ILLA, the act did not provide them with a private right to bring suit under that act).

[45] *Straus v Governor*, 459 Mich 526, 532; 592 NW2d 53 (1999).

[46] See *Fox v Univ of Michigan Bd of Regents*, 375 Mich 238, 243; 134 NW2d 146 (1965) ("A court which has determined that it has no jurisdiction should not proceed further except to dismiss the action."), citing *Lehman v Lehman*, 312 Mich 102; 19 NW2d 502 (1945).

[47] *In re Estate of Fraser*, 288 Mich 392, 394; 285 NW 1 (1939).

[48] MCR 2.613(A).

this purpose.[49] The panel in *Arnold*, however, failed to consider the comprehensive nature of the statutory scheme employed by the Legislature or the public purpose in devising that scheme, and we therefore reject its conclusion that suit by an individual is not foreclosed. In any event, because that case was decided before November 1, 1990, we are not bound to follow the decision.[50]

Moreover, contrary to plaintiff's assertion, Bambi Lake is not outside the scope of Part 307 of the NREPA because it is a private, as opposed to public, lake. Part 307 defines an "inland lake" over which the county commissioners have authority as simply "a natural or artificial lake, pond, [or] impoundment," without reference to the public or private nature of that body.[51] MCL 324.30701(f). The statutory definition does not require that the lake be public in order to be subject to the provisions of Part 307.[52]

Plaintiff's reliance on *Bott v Natural Resources Comm*[53] in arguing that no governmental agency has authority to set the level of a private lake is similarly misplaced. *Bott* did not involve an action to determine the normal level of a lake, but rather the test to be applied to determine the navigability of smaller streams and private lakes for purposes of the public

---

[49] *Arnold v Ellis*, 5 Mich App 101, 109-111; 145 NW2d 822 (1966).

[50] MCR 7.215(I)(1).

[51] MCL 324.30701(f).

[52] That the public or private nature of the lake is irrelevant is further supported by the fact that the purpose of the statute, as originally enacted, was to "protect the public health, safety and welfare . . . ." 1961 PA 146, preamble. Regulation of the lake level protects not only the riparian owners on Bambi Lake, but also those who reside downstream from the spillway.

[53] *Bott v Natural Resources Comm*, 415 Mich 45; 327 NW2d 838 (1982).

trust doctrine. Nothing in the Court's discussion of that matter is applicable to the question of circuit court jurisdiction at issue here.

That Bambi Lake is a private lake similarly does not support plaintiff's claim that initiation of proceedings by a government agency under Part 307 would amount to an unconstitutional taking of private property for a nonpublic purpose.[54] As noted above, the statutory procedures for establishment of a normal lake level were devised "for the protection of the public health, safety and welfare," as well as "the conservation of the natural resources of this state."[55] Even assuming that a governmentally initiated proceeding to determine the normal level of Bambi Lake could constitute a taking of private property, regulation of the lake level directly protects not only those private lands fronting the lake, but also those public resources and property interests located downstream from the spillway.[56] Accordingly, we are not persuaded that governmentally initiated proceedings to determine the normal level of a private lake are constitutionally infirm.

### B. DEFENDANT FORREST CUMMINGS' DEATH

Plaintiff next argues that, upon the death of defendant Forrest Cummings on January 8, 1999, the trial court's jurisdiction over the matter being litigated in Docket No. 226614 abated, rendering void all judg-

---

[54] See US Const, Am V; 1963 Const, art 10, § 2.

[55] 1961 PA 146, preamble.

[56] Cf. *Tolksdorf v Griffith*, 464 Mich 1, 8-9; 626 NW2d 163 (2001) (benefit to public at large under private roads and temporary highways act is purely incidental and far too attenuated to support constitutional taking of private property).

ments thereafter entered by the court. This argument is wholly without merit.

The death of a party during the pendency of an action neither abates the suit nor deprives a court of jurisdiction over the matter. The survival statute specifically declares that "[a]ll actions and claims survive death."[57] Consistent with this declaration, MCR 2.202(A)(1) permits a court to allow substitution of parties if a party dies and the claim at issue is not thereby extinguished.[58] Here, plaintiff offers no viable support for his assertion that his claim for damages and injunctive relief against the various defendants, including the decedent,[59] was extinguished upon Cummings' death. The authority cited by plaintiff for this proposition, *Hoffman v St Clair Circuit Judge*,[60] is inapposite, because that case involved the death of one of several defendants in an action for ejectment. Although the Court in *Hoffman* found that, because the decedent's rights in the real property passed to his heirs immediately upon his death, the action against the decedent abated, the Court nonetheless recognized that the suit against the surviving defendants properly continued. Accordingly, even assuming that the action abated with respect to defendant Forrest Cummings, Cummings' death had no effect on the court's ability to act with respect to the remaining defendants.

---

[57] MCL 600.2921.

[58] See, e.g., *Ponke v Ponke*, 222 Mich App 276, 279-280; 564 NW2d 101 (1997) (where party to a divorce action dies before entry of judgment, action abates because there is no longer any marriage to dissolve).

[59] See, e.g., *Thomas v Steuernol*, 185 Mich App 148, 156; 460 NW2d 577 (1990) (the defendant's personal representative properly substituted for the defendant on his death).

[60] *Hoffman v St Clair Circuit Judge*, 40 Mich 351 (1879).

C. MEDIATION AWARDS

Plaintiff next asserts that he is entitled to have the judgments entered on the mediation awards set aside on the ground of fraud.[61] Again, we disagree.

Initially, it should be noted that although counsel for plaintiff informally moved to have these awards set aside during argument at the January 20, 1999, hearing on defendants' motion for summary disposition, the matter was not pursued to a decision. Accordingly, this issue has not been preserved for appellate review.[62] Nonetheless, we conclude that plaintiff is not entitled to the requested relief.

Generally, a court should set aside a judgment on the acceptance of mediation only where a failure to do so would result in substantial injustice.[63] Here, despite plaintiff's claim that his acceptance of mediated damages was premised on a belief that a determination of the normal level of Bambi Lake would follow, there is nothing in the record to suggest that his acceptance was contingent on some future event or decision in the case. Moreover, regardless of the basis for plaintiff's acceptance of mediation, nothing guaranteed him a favorable decision in this regard. In any event, because the Shiawassee County Board of

---

[61] Although, in his statement of questions presented, plaintiff also asserts that he is entitled to file an amended complaint and add any party necessary to determine damages and the lawful level of Bambi Lake, he offers no argument or authority to support these claims. Accordingly, plaintiff has waived these issues on appeal. *In re Coe Trusts*, 233 Mich App 525, 537; 593 NW2d 190 (1999) ("A party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim.").

[62] *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999) (issues not decided by the trial court are not preserved for appeal).

[63] *Hauser v Roma's of Michigan, Inc*, 156 Mich App 102, 104; 401 NW2d 630 (1986).

Commissioners has since initiated an action to determine the normal level of Bambi Lake pursuant to Part 307 of the NREPA, plaintiff will ultimately receive the judicial determination he claims to have contemplated at the time he accepted the mediation awards. Accordingly, no injustice will result from permitting the challenged judgments to stand.

### D. MOTION FOR RELIEF FROM JUDGMENT

Plaintiff next argues that the trial court erred in denying his motion for relief from judgment in Docket No. 226614 without first conducting an evidentiary hearing on his claim that the court had been deceived into believing that, with the death of defendant Forrest Cummings, no one against whom to enforce an order to maintain Bambi Lake at the levels cited in the 1970 permit remained. We disagree.

A trial court's decision on a motion for relief from judgment is reviewed for an abuse of discretion.[64] In seeking relief from the February 3, 1999, order granting defendants summary disposition, plaintiff asserted below that despite defendants' claims at the January 20, 1999, hearing that the death of Cummings, the dam permit holder, precluded the trial court from entering any enforceable order pertaining to maintenance of the Bambi Lake spillway, the property rights to the spillway, and thus the obligations pertaining to its operation, passed to other individuals against whom such an order could be entered and enforced. The trial court, without conducting an evidentiary hearing on this matter as requested by plaintiff, found

---

[64] *Blue Water Fabricators, Inc v New Apex Co, Inc*, 205 Mich App 295, 300; 517 NW2d 319 (1994).

no fraud to have occurred and denied the motion. On appeal, plaintiff asserts that denial of his motion without the requested hearing was error.

Generally, where a party alleges that a fraud has been committed on the court, it is "an abuse of discretion for the court to decide the motion without first conducting an evidentiary hearing into the allegations."[65] However, courts understandably look with skepticism upon a dissatisfied party's claim of fraud and insist on strict factual proof.[66] Thus, where the party requesting relief fails to provide specific allegations of fraud relating to a material fact, the trial court need not proceed to an evidentiary hearing.[67] Here, although plaintiff raised valid concerns with respect to the trial court's finding that Cummings' death prevented it from entering an enforceable order regarding maintenance of the spillway, plaintiff failed to offer significant, specific allegations of fraud or misrepresentation on the part of defendants. Under these circumstances, we do not conclude that the trial court abused its discretion by denying plaintiff's motion without conducting an evidentiary hearing.[68]

In any event, even assuming that the trial court erred in failing to conduct the requested hearing, the error was harmless because, regardless of the existence of other individuals against whom the subject order could be enforced, dismissal of plaintiff's suit was required under MCR 2.116(C)(4) for lack of subject-matter jurisdiction.[69]

---

[65] *Rapaport v Rapaport*, 185 Mich App 12, 16; 460 NW2d 588 (1990).

[66] *Kiefer v Kiefer*, 212 Mich App 176, 179; 536 NW2d 873 (1995).

[67] *Young v Young*, 342 Mich 505, 507-509; 70 NW2d 730 (1955).

[68] *Id.*; see also *Kiefer, supra.*

[69] MCR 2.613(A).

III. DOCKET NOS. 226612 AND 226613

A. SUMMARY DISPOSITION

Plaintiff argues that the trial court erred in dismissing his claims in Docket Nos. 226612 and 226613 under MCR 2.116(C)(7), on the basis of res judicata. Plaintiff, however, makes no attempt to specifically address the propriety of summary disposition on these grounds with respect to any of the thirty-four defendants in these combined cases. Generally, "where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court."[70] Indeed, as our Supreme Court stated in *Mitcham v Detroit*:[71]

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.

In light of this failure, we find this issue to have been abandoned on appeal and, therefore, decline to address it. Nonetheless, as discussed in part IIA of this opinion, the trial court was without jurisdiction to render the requested relief in these actions, i.e., an order setting the "lawful normal" elevation of Bambi Lake, and was therefore obligated to dismiss the suit under MCR 2.116(C)(4) sua sponte. Consequently, any error in the trial court's application of res judicata to dismiss plaintiff's claims was harmless. Accordingly,

---

[70] *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).

[71] *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

we affirm the trial court's dismissal of plaintiff's claims in Docket Nos. 226612 and 226613.[72]

### B. ATTORNEY FEES, COSTS, AND SANCTIONS

Finally, plaintiff argues that the trial court erred in granting defendants attorney fees, costs, and sanctions. Again, we do not agree.

MCR 2.625(A)(2) provides that if the court finds that an action or defense is frivolous, it must award costs as provided by MCL 600.2591. Under this statute, "costs" includes "all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees."[73] An action is frivolous if, among other things, the losing "party's legal position was devoid of arguable legal merit" or it was initiated for the "primary purpose of harass[ing] . . . the prevailing party."[74] The filing of a signed pleading that is not well-grounded in fact and law subjects the filer to similar sanctions, pursuant to MCR 2.114(E).

Following the grant of summary disposition in Docket No. 226613, several defendants moved for attorney fees, costs, and sanctions pursuant to MCR 2.625 and MCR 2.114(E), arguing that plaintiff's claims in that action were frivolous. After a hearing on these motions, the trial court found that plaintiff's claims were not "well grounded in fact or law," and were filed "for the purpose of harassment or embarrass-

---

[72] See *Detroit v Presti*, 240 Mich App 208, 214; 610 NW2d 261 (2000) ("This Court will not reverse a trial court's order if it reached the right result for the wrong reason.").

[73] MCL 600.2591(2).

[74] MCL 600.2591(3)(a).

ment . . . but not for the purpose really of litigating genuine issues of material fact." The trial court accordingly concluded that the action was "absolutely frivolous" and awarded sanctions, costs, and attorney fees to a number of defendants.

On appeal, plaintiff argues that the trial court erred in awarding these fees and costs because his suit held arguable legal merit, and because defendants' conduct below makes any such award unconscionable. This Court will not disturb a trial court's finding that an action was frivolous unless that finding was clearly erroneous.[75] A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made."[76]

Plaintiff has failed to cite any specific conduct by defendants to support his claim that the trial court's award is unconscionable and, accordingly, has waived any appellate review on these grounds.[77] Further, with respect to the legal merit of the suit filed by plaintiff in Docket No. 226613, although filed as a claim to quiet title and determine interests in land, the relief sought by plaintiff in this subsequent action was in essence the same as that sought in the previous action filed against these defendants (Docket No. 226614), i.e., an order declaring that the "lawful normal" elevation of Bambi Lake, as established by the 1970 dam permit, was 799 feet above sea level, and that no county agency had authority to alter that

---

[75] *Szymanski v Brown*, 221 Mich App 423, 436; 562 NW2d 212 (1997).

[76] *In re Attorney Fees & Costs*, 233 Mich App 694, 701; 593 NW2d 589 (1999).

[77] See *Palo Group Foster Care, Inc v Dep't of Social Services*, 228 Mich App 140, 152; 577 NW2d 200 (1998).

level. Inasmuch as the trial court had previously ruled in that suit that the 1970 dam permit did not establish a legal lake level, and had dismissed the action for want of jurisdiction, we do not conclude that the trial court clearly erred in finding that a subsequent suit seeking to relitigate these same issues was frivolous.[78] Notwithstanding any arguable legal merit to plaintiff's claims in the prior suit, defendants were forced to twice incur the costs of answering and defending against those claims.

We affirm.

---

[78] In reaching this conclusion we note that, although not a practitioner, plaintiff is a licensed attorney in the state of Michigan.