GLEN LAKE-CRYSTAL RIVER WATERSHED RIPARIANS v
GLEN LAKE ASSOCIATION

Docket No. 248580. Submitted November 16, 2004, at Grand Rapids.
Decided December 7, 2004, at 9:00 a.m.

Glen Lake-Crystal River Watershed Riparians and others brought an
action in the Leelanau Circuit Court against the Glen Lake
Association (GLA) and Leelanau County, seeking modification of a
1954 circuit court order, which had modified a 1945 order, that
established the natural height and level of Glen Lake at 596.75 feet
above sea level. The GLA owns and manages a dam that controls
the amount of water that flows out of Glen Lake and into the
Crystal River, thus determining the level of both, and the plaintiffs
sought a new algorithm to be used to determine when more water
should be let loose from Glen Lake, particularly in drought times,
thus lowering the lake level from the 1954 order level, but raising
the river. The court, Philip E. Rodgers, Jr., J., determined that it
has continuing subject-matter jurisdiction over the review of the
earlier order pursuant to the inland lakes levels part (ILLP) of the
Natural Resources and Environmental Protection Act MCL
324.30701 *et seq.*, and, on the basis of testimony and other
evidence, adopted the water regulation algorithms proposed by the
plaintiffs, which algorithms require the maintenance of the level of
the lake within a range of plus two inches and minus three inches
of 596.75 feet above sea level. The GLA appealed, claiming that the
trial court did not have jurisdiction over the case, that the trial
court erred in finding that the 1954 lake level order caused
environmental harm to the Crystal River, and that the trial court
erred by allowing the Department of Environmental Quality and
the National Park Service to serve on a technical committee, which
committee was to implement the new lake level plan and develop
a monitoring plan.

The Court of Appeals *held*:

1. The circuit court had subject-matter jurisdiction over the
question of modifying the earlier circuit court lake level order.
Jurisdiction of the subject matter is the right of the court to
exercise judicial power over a class of cases, not a particular case.
The ILLP granted the circuit court continuing jurisdiction to

consider the necessity for changes in previously entered orders regarding normal lake levels for Glen Lake. MCL 324.30707(5).

2. The GLA claimed that the plaintiffs lack the legal capacity to sue under the statute. However, this argument has erroneously been framed as a jurisdictional question rather than a question of standing. While jurisdiction may be raised at any point, including after trial, lack of standing should have been raised in the defendant's first responsive pleading or in a motion filed before that pleading. MCR 2.116(D)(2). Failure to timely raise a defense based on lack of standing waives the defense. Further, the GLA acquiesced to the plaintiffs' right to sue by entering into a stipulation regarding the issues to be decided at trial and the implementation of the lake level determinations that would be carried out. It would waste judicial resources to hold judicial proceedings to which the GLA consented, and then dismiss the result of the proceedings on the basis of the GLA's claim of lack of standing. Because this is not an original action to establish a lake level, the court has continuing jurisdiction and the plaintiffs have standing under the ILLP.

3. The GLA claimed that the findings of fact by the trial court were clearly erroneous. The court determined that the plaintiffs presented more detailed and comprehensive evidence on the potential effect that modifying the lake level order might have on Glen Lake and the Crystal River and that the testimony of the GLA's lake expert was less convincing. The trial court considered the factors delineated in MCL 324.30707(4). The decision to adopt the plaintiff's plan and to reject the GLA plan exhibits no clear error.

4. The Department of Environment Quality and the National Parks Service were properly appointed as participants in the technical committee with the delegated functions of implementation of the order and monitoring the operation of the order. Although not parties in the suit, the statute defining "interested person" includes the department and any landowner, such as the park service that would be affected by a permanent change in the natural or normal level of an inland lake. MCL 324.30701(g).

Affirmed.

1. WATERS AND WATERCOURSES — INLAND LAKE LEVELS — SUBJECT-MATTER JURISDICTION.

A circuit court has continuing jurisdiction concerning the review of inland lake levels established by order of the circuit court under the inland lake levels part of the Natural Resources and Environmental Protection Act (MCL 324.30701 *et seq.*).

2. WATERS AND WATERCOURSES — INLAND LAKE LEVELS — MODIFICATION — STANDING.

Standing for bringing an action for modification of a circuit court order determining the level of an inland lake is determined by statute, and includes the Department of Environmental Quality and any landowner that would be affected by a permanent change in the natural or normal level of an inland lake (MCL 324.30701[g]).

*Olson, Bzdok & Howard, P.C.* (by *Christopher M. Bzdok* and *Scott W. Howard*), for the plaintiffs.

*Smith & Johnson, Attorneys, P.C.* (by *Louis A. Smith* and *C. Enrico Schaefer*), for the Glen Lake Association.

Before: WHITBECK, C.J., and BANDSTRA and JANSEN, JJ.

BANDSTRA, J. Defendant Glen Lake Association (GLA) appeals as of right the trial court order that modified the established normal level of Glen Lake under the inland lake levels part (ILLP) of the Natural Resources and Environmental Protection Act, MCL 324.30701 *et seq.* We conclude that the trial court had continuing jurisdiction to modify the lake level and that plaintiffs, private party riparian property owners, had standing to invoke that jurisdiction. Further, we do not conclude that the trial court's order was clearly erroneous on the merits and we affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

Glen Lake and the Crystal River are located in Leelanau County, immediately adjacent to the Sleeping Bear Dunes National Lakeshore. Water flows from Glen Lake over a dam into the Crystal River, which then meanders several miles before discharging into Lake Michigan. The dam controls the release of water from Glen Lake into the Crystal River. Therefore, any alter-

ations in the height of the dam result in converse effects on the Glen Lake and Crystal River systems: increasing the height of the dam results in an increased height of Glen Lake, but a decreased instream flow for the Crystal River.

In the early 1940s, in response to concerns about erosion damage caused by high water levels in Glen Lake, the Leelanau County Board of Supervisors filed an action in the Leelanau Circuit Court under the statutory predecessor of the ILLP to determine the "natural height and level," now MCL 324.30702, of the water in Glen Lake.[1] In 1945, the Leelanau Circuit Court entered an order setting the natural height and level of Glen Lake at 596.75 feet above sea level. In 1954, in response to a lawsuit that claimed that the lake level was being maintained at a level higher than 596.75 feet, the Leelanau Circuit Court ordered the Glen Lake Improvement Association (the predecessor of the GLA,) to establish a supervisory committee to operate the dam to maintain the court-ordered water level of 596.75 feet. Since that time, the GLA has normally maintained the water level at or near 596.75 feet by inserting and removing dam boards. At various times of dry weather, the supervisory committee allowed the water level to drop below 596.75 feet to supplement flow to the Crystal River.

In 2000, the GLA contracted to have a new dam built to allow for more precise incremental control over the lake water level. During construction in June 2001, the GLA's contractor completely shut off the flow of water to the Crystal River. The Michigan Department of Environmental Quality (DEQ) received numerous com-

---

[1] The predecessor statute, the Inland Lake Level Act (ILLA), 1961 PA 146, was substantively identical to the ILLP. *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 386 n 7; 651 NW2d 756 (2002).

plaints about extremely low water levels in the Crystal River and, upon investigation, observed low water levels, exposed mud flats, dry sand bars, and extensive fish kills.

In August 2001, plaintiffs, a small group of individual Crystal River riparian property owners and a canoe livery on the Crystal River, filed suit against the GLA, as the "delegated authority" to manage the dam. Plaintiffs also filed suit against Leelanau County. Plaintiffs sought to establish a new lake level, below the lake level set in 1945, to raise the height of the Crystal River. Plaintiffs alleged violations of the ILLP and the Michigan environmental protection act (MEPA), MCL 324.1701 *et seq.* However, the trial court only addressed plaintiffs' petition for a modified lake level order, and the GLA challenges only that ruling on appeal.

## II. ANALYSIS

### A. THE TRIAL COURT PROPERLY DETERMINED THAT IT HAD JURISDICTION OVER THE CASE

The GLA argues that the trial court erred in concluding that it had jurisdiction over this case. We disagree.

Whether the trial court had subject-matter jurisdiction is a question of law that we review de novo. *Rudolph Steiner School of Ann Arbor v Ann Arbor Charter Twp*, 237 Mich App 721, 730; 605 NW2d 18 (1999). Additionally, whether a party has standing is a question of law that we review de novo. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 612; 684 NW2d 800 (2004). Finally, the interpretation of a court rule is also a question of law that we review de novo. *Hinkle v Wayne Co Clerk*, 467 Mich 337, 340; 654 NW2d 315 (2002).

The GLA frames this argument in terms of subject-matter jurisdiction. That issue can be raised at any

point in the proceedings, including after the trial as occurred here. *Stanke v State Farm Mut Automobile Ins Co*, 200 Mich App 307, 319; 503 NW2d 758 (1993); MCR 2.116(D)(3). However, as discussed below the issue is really one of standing, not subject-matter jurisdiction. The GLA failed to preserve this issue, but, instead, effectively consented to plaintiffs' standing to sue by entering into stipulations regarding the trial and its objective. Accordingly, the GLA has waived this issue.

"Subject-matter jurisdiction and standing are not the same thing. Jurisdiction of the subject matter is the right of the court to exercise judicial power over a class of cases, not the particular case before it; to exercise the abstract power to try a case of the kind or character of the one pending." *Altman v Nelson*, 197 Mich App 467, 472; 495 NW2d 826 (1992). Under the ILLP, the trial court here clearly was granted "continuing jurisdiction" to consider the necessity for changes in the previously entered orders regarding the normal lake level for Glen Lake. MCL 324.30707(5). Accordingly, the GLA's challenge here is not about the trial court's jurisdiction over the subject matter at issue. Instead, the challenge is to plaintiffs' standing to invoke that jurisdiction.

The GLA's argument here is thus an attempt to have this matter dismissed because plaintiffs lack the legal capacity to sue under the statute. MCR 2.116(C)(5). However, this ground for dismissal of plaintiffs' action should have been raised in the GLA's first responsive pleading or in a motion filed prior to that pleading. MCR 2.116(D)(2). Because the GLA did not raise its standing challenge in that fashion, the issue is waived. MCR 2.111(F)(2); *Stanke, supra* at 319.

Imposition of these rules against the GLA here is appropriate. The GLA did not just fail to raise the standing issue early in the case, before discovery and

attempts at settlement, it also affirmatively acquiesced to plaintiffs' right to sue by entering into a stipulation agreeing to the entry of a modified lake level order and, to that end, specifying the issues to be decided at trial and the mechanisms by which lake level determinations would be implemented. "A party cannot stipulate a matter and then argue on appeal that the resultant action was error." *Chapdelaine v Sochocki*, 247 Mich App 167, 177; 635 NW2d 339 (2001). It would be unfair to plaintiffs and a waste of judicial resources to hold, following trial proceedings to which the GLA consented, that there was no standing to bring this action.

We acknowledge that the GLA raised its purported subject-matter jurisdiction argument largely on the basis of *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379; 651 NW2d 756 (2002), which was decided during the trial of this case. However, that provides the GLA no justification for its delay. The *Yee* decision was based on *Wortelboer v Benzie Co*, 212 Mich App 208, 214; 537 NW2d 603 (1995), and *In re Van Ettan Lake*, 149 Mich App 517, 525-526; 386 NW2d 572 (1986), both of which interpreted the statute as disallowing riparian property owners from bringing suit under the ILLP to initially determine a normal lake level. *Yee, supra* at 398-399. Thus, the GLA cannot claim that before *Yee* was decided it had no reasonable basis to assert its challenge against plaintiffs' right to bring this suit. This issue is not properly preserved for appellate review.

Further, on its merits, the GLA's argument fails. Although the GLA relies primarily on *Yee*, the issue presented in that case was whether private parties can initially bring an action to determine a lake level under the ILLP. The *Yee* Court held that they could not, but that the statute, instead, reserved the authority to initiate such an action to the counties and the DEQ. *Yee,*

*supra* at 397-398 and 398 n 42. This Court reasoned that "the Legislature clearly limited the court's power to determine legal lake levels to those actions initiated by" these public authorities. *Id.* at 398. Notably, this Court further stated, "Once such a determination has been made, however, circuit court jurisdiction over a lake's level continues." *Id.* at 398 n 41.

In this regard, the *Yee* Court relied on *Anson v Barry Co Drain Comm'r*, 210 Mich App 322, 325-326; 533 NW2d 19 (1995) and *Wortelboer, supra. Yee, supra* at 398-399 ns 41, 44. The plaintiffs in *Anson* were private owners of lakefront property who filed an action to enforce an existing lake level order. This Court reasoned that they could invoke the court's continuing jurisdiction under the statute. *Anson, supra* at 326. Similarly, the plaintiffs in *Wortelboer* were private property owners of land bordering an outlet stream from Crystal Lake. They brought an action against Benzie County claiming that the lake levels established by a previous court order under the inland lake statute were causing environmental damage to the stream. This Court noted that the plaintiffs had standing to bring the action both because they were "interested persons" under the statute and because they had a legally protected interest that was in jeopardy of being adversely affected. *Wortelboer, supra* at 213-214. Although holding that the statute did not authorize the plaintiffs to initiate an original action against the county,[2] this Court noted that, instead, "plaintiffs' proper remedy would be to petition the circuit court for reconsideration of the lake levels." *Id.* at 215.

---

[2] The Court reasoned that the statute "does not create or protect individual rights regarding inland lake levels or create a civil cause of action for the benefit of individuals who are not satisfied with the county's exercise of authority." *Id.* at 214.

Because this matter does not involve an original action to establish a lake level, the GLA's reliance on *Yee* is misplaced. This case involves plaintiffs' right to invoke the trial court's continuing jurisdiction over a matter already the subject of an existing lake level order. Consistent with *Anson* and *Wortelboer*, we conclude that plaintiffs had standing under the ILLP to invoke continuing jurisdiction in this action.[3]

### B. THE TRIAL COURT'S FINDINGS OF FACT WERE NOT CLEARLY ERRONEOUS

The GLA argues that the trial court erred in finding that the court-ordered lake level caused environmental harm to the Crystal River, and in entering a modified lake level order to remedy the damage caused by maintaining a lake level of 596.75 feet at the expense of the Crystal River riparian property owners. We disagree.

We review a trial court's findings of fact in a bench trial for clear error and we review de novo its conclusions of law. *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 651; 662 NW2d 424 (2003); MCR 2.613(C). "A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court is left with the definite and firm conviction that a mistake has been made." *Ambs, supra* at 652. "An appellate court will give deference to 'the trial court's superior ability to judge the credibility of the witnesses who appeared before it.' " *Id.*, quoting *Rellinger v Bremmeyr*, 180 Mich App 661, 665; 448 NW2d 49 (1989); MCR 2.613(C).

---

[3] In light of that determination and in consideration of the fact that the trial court did not consider or base its decisions on the non-ILLP allegations of plaintiffs' complaint, we need not determine whether plaintiffs had an independent cause of action under the MEPA.

Here, the parties stipulated the entry of a modified lake level order before trial, thereby acknowledging the necessity of a change in the court-ordered lake level. Again, "[a] party cannot stipulate a matter and then argue on appeal that the resultant action was error." *Chapdelaine, supra* at 177. The GLA's claim that the trial court erred in entering a modified lake level order is waived. All that is properly at issue is the substance of that order.

At trial, plaintiffs presented a management plan and regulation algorithms with the assistance of three expert consultants: Dr. Paul Moore, an associate professor in biology at Bowling Green State University, who was qualified as an expert in stream ecology; Dr. Roger Wallace, a professor in civil and environmental engineering at Michigan State University, who was qualified as an expert in hydraulics and hydrology; and Dr. Mark Luttenton, an associate professor of biology at Grand Valley State University and a research fellow with the Center for Integrated Limnology and Environmental Research at the University of Michigan, who was qualified as an expert in freshwater ecology, including limnology and stream ecology.

Dr. Moore visited the Crystal River on three separate occasions in August 2001, March 2002, and May 2002, during which he took photographs, field measurements, biological samples, and sediment samples. On the basis of his observations of the river and the organisms in the river, Dr. Moore determined that it was a benthic carbon driven river, meaning that "primary productivity" is generated by organisms living on the bottom of the river. Dr. Moore explained that it was important to determine where the primary productivity was occurring to "understand how flow is going to impact the system."

Dr. Moore identified three "critical habitats" within the river. First, because aquatic organisms need moist sediment, increasing the "wetted surface area" would result in more primary productivity. Second, the "emergent islands and microphytes," or reeds that have emerged out of the water, when wet, provide a larger surface area for increased marine algae growth, also resulting in more primary productivity. The emergent islands and microphytes also provide refuge to macro-invertebrates from predatory fish. Finally, fallen trees and debris, when submerged in water, provide areas where larval fish and minnows escape predation by waterfowl and fish.

Dr. Moore testified that on the basis of measurements taken from stream gauges, he was able to estimate the water levels necessary to maintain the key ecological functions of the river. Dr. Moore testified that a reading of 1.7 feet, which corresponded to a National Park Service (NPS) measurement at the same location, was a reasonable target level for the river, i.e., a water level at which the key ecological functions of the river could occur. Dr. Moore then extrapolated that 1.55 feet would be a level at which the key ecological functions of the river would be impaired, and 1.85 feet would be a high water level of the river at which the key ecological functions of the river would thrive.

Dr. Wallace then developed plaintiffs' regulation algorithms by incorporating consideration of the water level needs of the Crystal River and Glen Lake. Dr. Wallace explained that the water supply to the lake and the river came from precipitation minus evaporation. However, because of the historical practice of maintaining the court-ordered lake level by raising the dam, the river was doubly affected during periods of low precipitation. That is, not only would the river not receive

water from precipitation, it also would not receive water from the lake, because the lake was being maintained at an artificially high level through the use of the dam. Dr. Wallace explained that the management plan was intended to "bring some balance back with the system more in line with the way it would be if it weren't so highly regulated [by using the dam to maintain the lake level set by the court in 1945]."

In developing plaintiffs' regulation algorithms, Dr. Wallace relied on the figures set out by Dr. Moore, i.e., 1.85 feet (normal), and 1.55 feet (low) for the water levels in the river. For the water levels in the lake, Dr. Wallace used the high water level for the lake that was set out in the pretrial stipulation, i.e., 596.90 feet above sea level. Dr. Wallace used the normal water level for the lake that was set out in the 1945 court order, i.e., 596.75 feet above sea level. Finally, Dr. Wallace determined the low level for the lake on the basis of historical data and a field analysis of lake ecology, i.e., 596.50 feet above sea level. The management plan explained that the algorithms "make decisions based on [3] index levels for Glen Lake and another 2 index levels for the Crystal River." Specifically,

> [t]he May algorithm focuses on how to raise the new control gates—this is equivalent to adding stop logs—to achieve summer lake levels while [e]nsuring adequate flow in the Crystal River during a biologically critical period of time. The June-August algorithm focuses on how to manage lake levels during the summer recreational season. The Fall-Winter algorithm provides guidance on how to drop the control surface at the end of the recreation season in order to prepare for the coming winter and spring.

Dr. Luttenton then testified regarding the potential effect plaintiffs' proposed regulation algorithm would have on Glen Lake, if implemented. Dr. Luttenton relied on a comprehensive study of Glen Lake by Dr.

Timothy Keilty and determined that the primary potential effect of lowering the water level of Glen Lake would be on the fisheries and aquatic plant communities. In order to assess potential effects from a lower water level, Dr. Luttenton visited Glen Lake twice to develop a general impression of the lake and to confirm the information in the Keilty study. Dr. Luttenton assessed the basic characteristics of the lake and determined the habitat needs of the species of fish that inhabited the lake during each stage of their respective life cycles.

Dr. Luttenton testified that implementation of plaintiffs' regulation algorithm would not cause any problems for the species of fish that inhabited the lake. Indeed, Dr. Luttenton indicated that allowing the lake level to rise slightly in the spring would benefit two species at the egg stage in their life history. Dr. Luttenton testified that it was critical to maintain a high enough water level so that the fish could migrate out of wetland shore areas to deeper water during their transition from egg stage to juvenile stage. However, this typically happens by the end of June when the water levels are still high, and once migrated out, a drop in the water level of the lake would not affect the fish. Dr. Luttenton concluded that a drop in the water level of the lake three inches below the court-ordered level, as provided in the regulation algorithm, would result in shoreline exposure, but would not cause any detectable problems for the fish in Glen Lake.

The GLA presented a management plan and regulation algorithm with the assistance of Anthony Groves, a water resources director in the civil engineering division of Progressive Architecture and Engineering, who was qualified as an expert in limnology. On the basis of his computation of the long-term average water level of Glen Lake at 596.75 feet, Groves concluded:

> Maintaining a level above 596.75 feet in Glen Lake will exacerbate the potential for shoreline damage during periods of above-normal precipitation and high water. There appears to be a significant potential for erosion, and damage to shoreline structures and septic systems if a water level above 596.75 persists on Glen Lake. Conversely, maintaining a level significantly below 596.75 feet will create the potential for navigational difficulties in the lake during periods of below-normal precipitation and low water. It is important to note that lowering the water level of Glen Lake by only two or three inches could expose several feet of bottomland along the lake shoreline. Further, lowering the lake level would allow additional sunlight penetration to the lake bottom and expand the photic zone in which submersed aquatic plants can colonize.
>
> Maintaining a minimum flow of 18 cfs [cubic feet per second] in the Crystal River during the summer months will sustain a river stage of about 1 foot and a wetted perimeter of about 37 feet in the first straight river stretch below the dam. This minimum flow appears sufficient to protect and sustain the biological integrity of the Crystal River system.

Groves then recommended that no departure be made from the court-ordered lake water level of 596.75 feet, except during drought conditions during summer months. Groves proposed that to alleviate the potential for hardship to the Crystal River as the result of diminished outflow during the summer months, Glen Lake be temporarily lowered to a level not below 596.60 feet until the flow in the river equals or exceeds 18 cfs.

The trial court issued its decision and order, modifying the existing court-ordered lake level and adopting the regulation algorithms proposed by plaintiffs. The trial court made the following findings of fact and conclusions of law:

> The effects of low water on the river were discussed by a number of experts. Not surprisingly, they include damage

to the fish population and rooted aquatic plant communities as well as loss of primary productivity in the river. Additional impacts are felt by the river's mussel and clam population[s], its communities of benthic insects and a deleterious impact on other aquatic plants and animal communities. There are also harmful increases in water temperature. Naturally, reductions in flow also impair navigability which impacts the recreational public, including but not limited to visitors to the national lakeshore. Riparian owners along the river are also impacted by reduced navigability, impacts on the river's biology as well as loss of scenic and property values.

Recognizing a long tradition of balancing the needs of the lake and the river and mitigating the harm associated with erosion from high water on Glen Lake, the Court finds it necessary to institute a modified lake level order with regulation algorithms that will provide a more precise mechanism for managing the lake level and sharing the environmental burden of drought.

A key finding by this Court is that the Crystal River is not merely a tool used to maintain Glen Lake's water level. Rather, it is a viable part of the watershed, and, the management of Glen Lake's water level must be done so as to minimize environmental consequences to both the lake and the river.

This Court has continuing jurisdiction to enforce and modify its 1945 and 1954 Lake Level Orders for Glen Lake. See, *Yee, Wortelboer, supra,* and MCL 324.30707(5). Individuals aggrieved by this Court's Lake Level Orders may file petitions to modify them and this Court has continuing authority to revisit the Orders from time to time. However, persons who feel aggrieved by this Court's lake level Orders must understand that they have not and will not be issued in a vacuum. The focus of this Court's efforts are environmental and recreational. The Court is not motivated to maximize income to commercial canoe liveries or minimize the length of docks. There are a number of well-established criteria that must play a role in the determination of a lake level and in any subsequent determinations to modify it. These factors would certainly

include a consideration of past lake level records and the normal seasonal fluctuations of lake level. In this process, ordinary high and low water marks have been determined and evaluated. Both the lake and the river have been the subject of substantial development. It is important in determining the levels of each that a consideration be given to septic tanks, drain fields, sea walls, docks and other physical features.

The lake and the river have been the subject of extensive government study. Government surveys and reports have been provided to the Court as well as studies of the watershed's hydrology. Although the national lakeshore and the federal government were not parties to this action, they did submit reports that are relevant to this Court's decision and those reports have been considered.

There is a clearly established relationship between the lake and the river. The river provides upstream drainage from the lake and the stream has its own downstream flow requirements and impacts on downstream riparians. Property owners generally understand this relationship and historically managed the lake level with respect for it. Property owners on the lake and the river have well-recognized riparian rights which include but are not limited to recreational use of the surface waters, fishing and protection of wildlife habitat.

Consistent with the [ILLP], the Court considered these factors as they were offered through the testimony and evidence received at trial. MCL 324.30707(4). Having reviewed this evidence, the Court finds that the [ILLP] and *Wortelboer* contemplate that more than one lake level may be established. MCL 324.30701(H). In fact, the [ILLP] does not set a maximum or minimum number of levels for a lake and provides that lake levels may vary seasonally. MCL 324.30707(5). While the 1945 and 1954 Lake Level Orders have established 596.75 feet as the natural level of Glen Lake, management of this level has indeed recognized seasonal fluctuations and, for most of its history, a balanced management approach between the lake and river. Conversely, the notion that maximizing benefit to Glen Lake riparians can occur without a consideration of the down-

stream consequences on the Crystal River is not consistent with the [ILLP], existing Lake Level Orders or the substantial history of water level management by the Glen Lake Association.

Accordingly, to accomplish all those purposes set forth in MCL 324.30707(4), the Court finds that the history of managing Glen Lake's water level on a seasonal basis and in response to changing conditions has been and continues to be a sound approach. Consistent with the enhanced technology associated with the improved dam and the greater recognition of the relationship between the lake and the river, the Court adopts the Crystal River Management and Implementation Plan ("Plan") with the Order Modifying 1945 and 1954 Glen Lake Level Orders that is being entered concurrently with this Decision and Order.

In adopting this Plan, it is the Court's goal, consistent with the state statutes and appellate precedent, to maximize the natural resources of this state while preserving and protecting property around the lake and the river and to do so in the interest of public health, safety and welfare. Although management of high water has not proven to be as challenging as the management of low water conditions, the Plan addresses both.

Due to the parties' agreement that a modified Lake Level Order needs to be implemented and that regulation algorithms are appropriate and the Court's findings that its continuing jurisdiction is clear and that the [ILLP] and appellate precedent sensibly recognize the variables that affect a lake level necessarily contemplate the potential for different levels that respect different seasons and changing environmental conditions, this Court is not making findings other than on Count I of the Plaintiffs' complaint. It believes that complete relief can be provided to the parties without a consideration of MEPA, common[-]law riparian rights or claims of contempt for violation of the current Lake Level Order. The Court believes that this relief may be fully implemented through the Plan which it hereby adopts with its modified Lake Level Order. This Court further contemplates that this Plan shall be implemented on a dynamic basis and looks forward to adjusting its

elements as further information regarding the hydrology and biology of the watershed becomes available. The Court also looks forward to further input from the federal authorities responsible for managing the national lakeshore.

The Court and the parties agree that the Association's water level committee shall have sole authority and responsibility to manipulate the gates of the dam in accordance with the Plan, the modified Lake Level Order, the terms of this Decision and the continuing supervisory jurisdiction of the Court.

In adopting the plan proposed by plaintiffs, the trial court specifically found it to be a better approach than that proffered by the GLA:

The Court has received and reviewed the alternative Glen Lake Level Control Algorithm and adopts that submitted by Plaintiffs as it is more sophisticated, should produce more technical data and is more likely to provide the effective, dynamic management tool this Court finds to be essential to the long term maintenance of a healthy lake level and river flow.

In conjunction with the issuance of its opinion and order, the trial court entered an order modifying the 1945 and 1954 Glen Lake Level Orders from "[t]he existing legal lake level of 596.75 feet above sea level . . . to 596.75 feet above sea level with a range of up to plus two inches above and minus three inches below that level." The order provided that "[t]he lake level shall continue to be allowed to vary seasonally and in response to changing conditions in the way that has historically occurred, subject to the terms [of] this Order." Moreover, the order adopted plaintiffs' management plan and seasonal algorithms, "[i]n order to better accomplish the purposes set forth in MCL 324.30707(4)," and "for the protection of the river, lake, and associated natural resources under MCL 324.1704(1)."

The trial court determined that plaintiffs presented more detailed and comprehensive evidence on the potential effect that modifying the lake level order might have on Glen Lake and the Crystal River and that the testimony of the GLA's lake expert was less convincing. The trial court considered the factors set out in MCL 324.30707(4),[4] and properly entered a modified lake level order setting the "normal level" of the lake to "provide the most benefit to the public; [] best protect the public health, safety, and welfare; [] best preserve the natural resources of the state; and [] best preserve and protect the value of property around the lake." MCL 324.30701(h). The trial court's decision to adopt plaintiffs' regulation algorithms and management plan was supported by the evidence, and we find no clear error.

---

[4] MCL 324.30707(4) provides:

In a determination of the normal level of an inland lake, the court shall consider all of the following:

(a) Past lake level records, including the ordinary high-water mark and seasonal fluctuations.

(b) The location of septic tanks, drain fields, sea walls, docks, and other pertinent physical features.

(c) Government surveys and reports.

(d) The hydrology of the watershed.

(e) Downstream flow requirements and impacts on downstream riparians.

(f) Fisheries and wildlife habitat protection and enhancement.

(g) Upstream drainage.

(h) Rights of riparians.

(i) Testimony and evidence offered by all interested persons.

(j) Other pertinent facts and circumstances.

### C. THE TRIAL COURT DID NOT ERR IN ORDERING THE DEQ AND THE NPS TO PARTICIPATE IN THE TECHNICAL COMMITTEE

The GLA also argues that the trial court erred in ordering the DEQ and the NPS to participate in the technical committee because it did not have jurisdiction over those entities because they were not parties to the litigation. We disagree.

The trial court order modifying the preexisting lake level order provided for the formation of a technical committee, to be composed of one member from each of the following: the GLA, the Crystal River Association, the water level committee, the DEQ, the NPS, and the Office of the Leelanau County Drain Commissioner. The trial court ordered the technical committee to develop an implementation plan and a monitoring plan, and to serve as an advisory body and information-gathering resource for the water level committee. Additionally, the trial court ordered the technical committee to annually compile the data and results generated by the monitoring plan and prepare a report for the court, presenting the data and results of monitoring, and recommending any changes or adjustments to the regulation algorithms deemed appropriate. The order provided that the technical committee, the GLA, or the Crystal River Association could seek a hearing before the court regarding the recommendations in the report, or that the court could hold a hearing by its own initiative. Finally, the order provided that the technical committee was to hold meetings no fewer than three times a year.

Initially, as plaintiff points out, the GLA does not have standing to dispute the trial court's appointment of the DEQ and NPS to the technical committee. "To have standing to appeal means that a person must be

'aggrieved' by a lower body's decision." *Dep't of Consumer and Industry Services v Shah*, 236 Mich App 381, 385; 600 NW2d 406 (1999); MCR 7.203(A). The GLA has provided no authority to suggest that it is properly considered to be "aggrieved" merely because the DEQ and the NPS will be part of the technical committee's advisory process. Moreover, the record indicates that the DEQ and the NPS have voluntarily participated in technical committee meetings since entry of the order.

Further, MCL 324.30701(g) defines "interested person" as "the department and a person who has a record interest in the title to, right of ingress to, or reversionary right to land that would be affected by a permanent change in the natural or normal level of an inland lake." The statute specifically mentions the department, i.e., the DEQ, as an "interested person." And the NPS, as overseer of the Sleeping Bear Dunes, through which the Crystal River runs, is an "interested person" because it would be affected by changes in the level of Glen Lake. As interested persons, the DEQ and the NPS were entitled to provide "testimony and evidence" to the court regarding the appropriate normal lake level, MCL 324.30707(4)(i), and we see no reason they should be disallowed from providing the trial court continuing assistance with respect to adjustments to that level that might become necessary.

Finally, as plaintiff points out, the establishment of the technical committee is somewhat akin to the appointment of an expert witness, which the trial court has the authority to appoint under MRE 706. The rule specifically allows a court to choose an expert "of its own selection." MRE 706(a). We find no error in the trial court's decision to include in the technical commit-

tee entities with the sorts of expertise represented by the DEQ and the NPS.[5]

The GLA's argument that the trial court erred in establishing a technical committee including the DEQ and the NPS is without merit.

### III. PLAINTIFFS' CROSS-APPEAL

We note that while an appellee is not limited to the issues raised by an appellant if a cross-appeal is filed pursuant to MCR 7.207, *Bhama v Bhama,* 169 Mich App 73, 83; 425 NW2d 733 (1988), plaintiffs do not raise any additional issues in their cross-appeal and merely reiterate their responses to the issues raised on appeal by the GLA. Therefore, because we have already addressed the issues in the context of the GLA's appeal as of right, we decline to address them in the context of the cross-appeal.

### IV. CONCLUSION

We recognize that this case presents environmental and ecological issues of great effect and sensitivity. We commend all parties, as well as the trial court, for the manner in which these issues have been addressed. While some may view today's result more favorably than others, we appreciate that all involved here have responsibly been seeking an overall approach that will best serve the entire Glen Lake and Crystal River water system.

The trial court's decision to adopt plaintiffs' regulation algorithms and management plan was supported

---

[5] Again, in light of the fact that the trial court did not consider plaintiffs' MEPA claims, there is no need to additionally consider the propriety of the DEQ or NPS involvement as disinterested, technically qualified "masters" under MEPA. See MCL 324.1703(2).

by the evidence and was not clearly erroneous. We affirm the trial court's entry of a modified lake level order.