*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KEVIN MCMAHAN and CATHY MCMAHAN,

        Plaintiffs/Counterdefendants-
        Appellants,

v

JAMES A. KURISH and APRIL L. KURISH,

        Defendants/Counterplaintiffs-
        Appellees.

UNPUBLISHED
August 31, 2023

Nos. 359621; 360197
Roscommon Circuit Court
LC No. 18-724260-CH

Before: GADOLA, P.J., and PATEL and MALDONADO, JJ.

PER CURIAM.

Plaintiffs/counterdefendants (hereinafter "plaintiffs"), Kevin McMahan and Cathy McMahan, appeal as of right an order assessing damages against them and also appeal as of right a subsequent final judgment, wherein the court incorporated further award monies after resolving a motion for reconsideration filed by defendants/counterplaintiffs (hereinafter "defendants"), James A. Kurish and April L. Kurish. The orders were entered by the lower court following a bifurcated bench trial on liability and damages. We affirm.

A vacation home (which the court, by way of later summary-disposition proceedings, determined had been owned solely by James and not by James and April) was foreclosed upon by the county, and plaintiffs purchased it at a tax auction in August 2018. After plaintiffs filed suit to quiet title, defendants, in their countercomplaint, alleged that plaintiffs did not follow proper procedures with regard to obtaining possession of the home; they sought damages for conversion of personal property located on the premises and for wrongful eviction. April asserted that even though James had technically been awarded the home when she and James divorced in 2013, she continued to use it on a regular basis as a vacation home and had many personal belongings stored there. Although the court did quiet title to the home in favor of plaintiffs, the court found for defendants on the counterclaims for conversion and wrongful eviction and awarded them a total of $36,379.32 in damages and attorney fees. On appeal, plaintiffs contend that (1) two unpublished cases from the Court of Appeals mandate reversal; (2) no conversion took place; and (3) plaintiffs were not liable under the anti-lockout statute, MCL 600.2918.

This Court reviews a trial court's conclusions of law de novo and its findings of fact for clear error, giving deference to the trial court's better ability to judge the credibility of the witnesses who appeared before it. *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004). "A finding is clearly erroneous where, although there is evidence to support the finding, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652; 662 NW2d 424 (2003).

The focus of plaintiffs' argument on appeal is "whether the law cited by the trial court supports *any* awarding of damages." Accordingly, the ostensible bases for the trial court's monetary award will be examined.

A large portion of the award was based on MCL 600.2918. MCL 600.2918 states, in part:

> (1) Any person who is ejected or put out of any lands or tenements in a forcible and unlawful manner, or being out is afterwards held and kept out, by force, is entitled to recover 3 times the amount of his or her actual damages or $200.00, whichever is greater, in addition to recovering possession.

> (2) Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner is entitled to recover the amount of his or her actual damages or $200.00, whichever is greater, for each occurrence and, if possession has been lost, to recover possession. Subject to subsection (3), unlawful interference with a possessory interest includes 1 or more of the following:

> (a) Use of force or threat of force.

> (b) Removal, retention, or destruction of personal property of the possessor.

> (c) Changing, altering, or adding to the locks or other security devices on the property without immediately providing keys or other unlocking devices to the person in possession.

> (d) Boarding of the premises that prevents or deters entry.

> (e) Removal of doors, windows, or locks.

> (f) Causing, by action or omission, the termination or interruption of a service procured by the tenant or that the landlord is under an existing duty to furnish, which service is so essential that its termination or interruption would constitute constructive eviction, including heat, running water, hot water, electric, or gas service.

> (g) Introduction of noise, odor, or other nuisance.

At the time of the tax sale, MCL 600.2918(3) stated:

An owner's actions do not unlawfully interfere with a possessory interest if any of the following apply:

\* \* \*

(c) The owner believes in good faith that the tenant has abandoned the premises, and after diligent inquiry has reason to believe the tenant does not intend to return, and current rent is not paid.[1]

Plaintiffs take some time on appeal explaining why subsection (1) does not apply, but the trial court did not rely on subsection (1) in awarding damages. It relied solely on subsection (2), and specifically on subsection (2)(c), relying on plaintiffs' changing of locks[2] and posting of security cameras and no-trespassing signs. And, significantly, April[3] did not request any damages in connection with MCL 600.2918(2)(b). Accordingly, the pertinent question is whether the trial court properly made a finding of liability under MCL 600.2918(2)(c).

Plaintiffs contend that neither James nor April was a "tenant" for purposes of MCL 600.2918(2). The key here, however, is that the auction receipt from the tax sale, initialed by Cathy, states, under the heading "Terms of Sale":

*Occupants* of purchased property should be treated as tenants holding over under an expired lease. This means that legal eviction and/or possession proceedings will be necessary to effectuate control over such property. [Emphasis added.]

In *Deroshia v Union Terminal Piers*, 151 Mich App 715, 717; 391 NW2d 458 (1986)[4], the plaintiff remained on real property after the termination of his lease. "The sole issue raised by the parties in the briefs on appeal [was] whether a landlord may resort to self-help in the form of changing the locks on the leased premises to gain repossession and evict a holdover tenant." *Id*.

---

[1] As of July 1, 2019, subparagraph (c) reads:

The owner, or a court officer appointed by or a bailiff of the court that issued the court order or the sheriff or a deputy sheriff of the county in which the court is located, believes in good faith that the tenant has abandoned the premises, and after diligent inquiry has reason to believe the tenant does not intend to return, and current rent is not paid. [See 2019 PA 41.]

[2] Kevin testified that he had not been willing to send James a key.

[3] James was severely and chronically ill and had difficulty traveling, and the court based its monetary award on the impact plaintiffs' actions had on April's use of the vacation premises, not on James's use.

[4] This Court is not strictly required to follow opinions decided before November 1, 1990, but they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases. MCR 7.215(J)(1); *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

at 718. The Court stated that MCL 600.2918(2)(c) "virtually eliminates the self-help remedy in Michigan in favor of judicial process to remove a tenant wrongfully in possession." *Id*. at 719. It added:

> The . . . subsection follows the modern trend and, like the former forcible entry and detainer statute, was intended to prevent parties from taking the law into their own hands in circumstances which are likely to result in a breach of peace. The landlord is not permitted to be the judge of his own rights in the adversely held property, but must use the judicial remedy given by law to secure it. [*Id*.]

The Court stated that summary eviction proceedings are the proper processes, and that "the landlord is, in addition to repossession, entitled to damages from the time of demand for possession or notice to quit." *Id*. at 719-720. It went on:

> Considered together, these statutory remedies provide a complete answer to the landlord who seeks to remove a tenant in possession who has neither abandoned nor voluntarily surrendered the premises. Contrary to defendant's contention on appeal, *we hold that subsection (2) of the antilockout statute prohibits a landlord from resorting to self-help even where the landlord is entitled to possession*. Instead the landlord must, on refusal of the tenant to surrender the leased premises, resort to judicial process. To discourage self-help, the Legislature has provided that the tenant may recover treble damages for forcible ejectment under subsection (1), and actual damages for other unlawful interference under subsection (2). [*Id*. at 720 (emphasis added).]

The *Deroshia* Court indicated that "the holdover tenant's damages are limited to those damages suffered as a direct result of the landlord's use of the improper procedure." *Id*. at 722.

We conclude—viewing the contents of the home, the well-kept state of the home, the auction receipt, April's testimony about seasonal occupancy, and *Deroshia* together—that the trial court did not err by concluding that April was a tenant for purposes of MCL 600.2918(2). The terms of sale explicitly indicated that an "[o]ccupant[]" was to be treated as a holdover tenant, and *Deroshia* indicates that holdover tenants can obtain relief under the anti-lockout statute. See *id*.

There was ample evidence that the home was occupied at the time of the tax sale. A neighbor testified that

> the guy that posted the [tax sale] signs came over my house [sic] and had a conversation with me about the house and asked me if there were people in the house and if they had ever come up because his comment was he usually didn't see properties in that nice a shape when they were doing tax foreclosures.

Upon entering the house after the auction, Cathy saw a hamper of dirty clothing and also saw "standard household items" such as furniture, tables, and appliances. Significantly, she described it as "[t]he usual stuff you would see in a cottage." Cathy admitted that there had been gas usage, according to a utility bill, immediately before April 2018. Plaintiffs sent a "notice to quit" to James

stating that he needed to move, which evidenced their knowledge that the home was, in fact, occupied and had not been abandoned.

Plaintiffs argue that even if James could possibly be viewed as a "tenant," April could not. The trial court's award of damages on the basis of the anti-lockout statute was directed solely toward April. But again, the terms of sale explicitly indicated that an "[o]ccupant[]" was to be treated as a holdover tenant, and ample evidence indicated that April was, indeed, a seasonal occupant of the vacation home. Even if plaintiffs had initiated eviction proceedings solely against James (determined by the court to be the sole owner of the property, despite the facts that the names of both James and April were on the tax-assessment rolls and that the deed to James was never recorded), such proceedings would have encompassed April's permissive occupancy.

Plaintiffs rely on *Nelson v Grays*, 209 Mich App 661; 531 NW2d 826 (1995). In that case, the plaintiff lost power in her rented home when defendant landlord failed to pay the electric bill as he agreed to do. *Id*. at 662. Plaintiff sought $200 in anti-lockout statutory damages for herself and, separately, for her children. *Id*. This Court concluded that

> the record is devoid of any evidence that plaintiff's children had a separate contractual right to occupy the premises. Rather, the children had a right to occupy the mobile home because of plaintiff's lease contract with defendant. Thus, the court properly awarded $200 in damages under § 2918(2)(f) to plaintiff only in her individual capacity. [*Id*. at 666.]

The Court noted that a "tenant" is "the individual or individuals who pay consideration to the landlord for the right to occupy rental property, rather than the members of the larger family unit dwelling in the rental property." *Id*. at 665. The Court concluded:

> Under the principle of strict construction, we believe that the Legislature's intent to include the children of lessees as "tenants" under § 2918 must affirmatively appear in the statutory language. Because no such language is found in § 2918, we conclude that both the district court and the circuit court correctly determined that plaintiff's minor children were not considered "tenants" entitled to statutory damages pursuant to § 2918(2). [*Id*. at 666.]

We conclude that *Nelson* is not controlling for the purposes of the present case, which does not involve an actual lease agreement but instead an implied-in-law "holdover tenancy" existing by virtue of occupancy and the express terms of the tax sale.

Plaintiffs are focusing their appellate arguments on whether there was a tenant for purposes of the statute and on whether the property had been abandoned. They state on appeal:

> A trial on damages, lasting two full days, June 29-30, 2021, was thereafter held, and, on information and belief, it is largely this area of the case in which the Cross-Appeal is focused. TR, 6/29/21 and TR 6/30/21. *Accordingly, as Plaintiff-Appellants are not here appealing the amount of damages, but rather the question of whether the law cited by the trial court supports any awarding of damages*, for

considerations of space and economy, the Plaintiff-Appellants will set forth the events of the trial on damages in their Cross-Appellees' Brief. [Emphasis added.]

Defendants' cross-appeal has subsequently been dismissed by stipulation. Given this concession by plaintiffs, we decline to delve into whether the amount of damages assessed was appropriate.

As for conversion, the trial court concluded that that no monetary damages were available for this cause of action under applicable caselaw because the personal property had been returned to April, she did not adequately demonstrate that any of it was missing, and her allegations of physical damage to it were speculative.[5] However, even though the court concluded that no monetary damages were available, an analysis of conversion is still necessary because statutory conversion provided the basis for the trial court's award of attorney fees. MCL 600.2919a states:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

Plaintiffs do not argue on appeal that attorney fees were unavailable because defendants were not damaged. Instead, they argue that they did not convert any property and especially did not convert any property to their "own use."

The Michigan Supreme Court discussed statutory conversion in *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337; 871 NW2d 136 (2015). In that case, the defendant, a warehouse operator, moved the plaintiff's wine from a climate-controlled space, allegedly spoiling it. *Id*. at 341-342. The defendant argued that for the wine to have been converted to its own use, the defendant would have to have drunk or sold it. *Id*. at 358. The Supreme Court disagreed and adopted a broad definition of "own use," stating that "conversion 'to the other person's own use' requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id*. at 358-359. Crucially, the Court then stated:

> In arguing that it did not commit statutory conversion, [the defendant] claims that it moved the wine from its temperature-controlled storage area to complete a renovation project at its warehouse. Even considering just this admission, we agree with the Court of Appeals that a jury could consider the act of moving plaintiff's wine contrary to the contract in order to undertake an expansion project to benefit itself to be an act of employing the wine to [the defendant's] own

---

[5] See, e.g., *Magley v M & W Inc*, 325 Mich App 307, 324; 926 NW2d 1 (2018) (stating that "plaintiff can recover damages for the reasonable value for the loss of use during the period that the items were unlawfully kept from plaintiff").

purposes constituting "use" of the wine. [*Id*. at 360 (quotation marks and citation omitted.]

Here, Cathy admitted that personal property was moved in order to make improvements to the premises. She admitted that she moved personal property to the pole barn to benefit herself. Under the binding authority of *Aroma Wines*, this was sufficient to show that the property was put to plaintiffs' own use.

Plaintiffs argue that they did nothing wrong in connection with the personal property. However, the auction receipt stated:

> We do not own, and we are not selling any items of PERSONAL PROPERTY that may be found on any property purchased today. All such personal property is still owned by the former owner and/or *occupants* of the premises. [Emphasis added.]

The testimony makes clear that plaintiffs were relying on a 2013 divorce decree to decide, by themselves, that April had no claim to the contents of the home, despite demand letters she had given to plaintiffs. The trial court did not err by concluding that it was inappropriate for plaintiffs to have concluded that, merely because James was awarded the home and some of the personal property in 2013, he remained, in August 2018, the sole owner of all personal property on the premises. Plaintiffs had April's demand letters and the contact information for April's attorney, yet they held onto the personal property without contacting the attorney. They also learned, subsequently, that James had conveyed all the personal property to April, yet they still did nothing, and they did not initiate eviction proceedings as referred to in the notice to quit they sent to James. Accordingly, we conclude that the trial court, as the finder of fact, did not clearly err by finding that statutory conversion had occurred. Another fact-finder might have concluded differently, given the uncertainty surrounding the personal property, but we conclude that a reversal of the court's finding is not appropriate.

Plaintiffs contend that two unpublished cases mandate a finding that defendants had no interest in the real or personal property after the tax sale. The most obvious problem with this argument is that unpublished cases are not binding. *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).[6] We will, nevertheless, discuss the two cases in question: *Tambs v Jennings*, unpublished per curiam opinion of the Court of Appeals, issued February 5, 2019 (Docket No. 340498), and *Ritchie v Attisha*, unpublished per curiam opinion of the Court of Appeals, issued January 14, 2021 (Docket No. 351061).

In *Tambs*, unpub op at 1, a mortgage company obtained real property through foreclosure and initiated eviction proceedings. "Pursuant to a consent judgment of possession, plaintiffs agreed that the mortgage company could apply for an order of eviction if plaintiffs failed to vacate the premises by November 16, 2014. The plaintiffs moved out of the home by that date, but they left personal property behind." *Id*. at 1. The defendants purchased the real property from the mortgage company and found that "plaintiffs left garbage strewn throughout the house, that the

---

[6] They can be used for their persuasive or instructive value. *Id*.

furnace was not functioning, that the doors were not secured or locked, and that there was a dead dog under the porch." *Id*. The plaintiffs sought claim and delivery. *Id*. This Court stated:

> We hold that the interest or right plaintiffs had in the personal property did not survive expiration of the redemption period, entry of the possession judgment, plaintiffs' subsequent failure to remove the property by the date to vacate, at which time they left the house unlocked and vulnerable to theft, and plaintiffs' additional failure later to appear at the scheduled December meeting without a timely excuse. Considering this series of events and failures, we conclude that as a matter of law, plaintiffs abandoned the personal property they left behind. [*Id*. at 2.]

The present case is different. No eviction proceedings were filed, there was no consent judgment of possession, and April was not given any chance to retrieve the property. Furthermore, neither James nor April left the house unsecured and in a state of disrepair. The *Tambs* Court added:

> We have a final thought on this case. The foreclosure and the eviction action were pursued by the mortgage company, and the consent possession judgment was entered into by plaintiffs and the mortgage company. The mortgage company was still the owner of the property when the date to vacate passed. Only thereafter did defendants purchase the property from the mortgage company. Defendants obtained fee simple title at that time, buying a house that still had personal property inside. There was no transaction or conveyance of any kind between plaintiffs and defendants, nor was there a landlord-tenant relationship between the parties, especially given that plaintiffs had vacated the property by the time of purchase. Under these circumstances, we fail to see how defendants could possibly have unlawfully detained the personal property at issue. [*Id*. at 3]

Again, in the present case, there was no date to vacate pursuant to a consent judgment. In addition, the auction receipt specifically stated:

> We do not own, and we are not selling any items of PERSONAL PROPERTY that may be found on any property purchased today. All such personal property is still owned by the former owner and/or occupants of the premises.

Plaintiffs' reliance on *Tambs* is not persuasive.

In *Ritchie*, unpub op at 1, the defendant purchased real property at auction in August 2015, after it was foreclosed upon by the government. The plaintiff, the former owner of the home, brought a conversion claim regarding personal property in the home. *Id*.. The defendant argued that the personal property had been abandoned for years. *Id*. The plaintiff admitted "that she stopped living at the house . . . in 2012, after a fire occurred and the City of Southfield condemned the house as unsafe." *Id*. This Court said that "from the time Oakland County acquired the property to the time it sold the property to defendant, plaintiff made no effort to remove her personal property." *Id*. at 3. It continued, "Thus, as the trial court held, plaintiff abandoned her personal property. In fact, the house had been condemned as uninhabitable for about two years before Oakland County became the title owner of the property." *Id*. The Court also said that "it

is undisputed that plaintiff did not live at this condemned, uninhabitable property either before or after Oakland County became the title owner. And once defendant purchased the subject property from Oakland County in August 2015, defendant became the owner of that property, including the house and all of its contents." *Id.*

The present case is different. As discussed *supra*, there was sufficient evidence of occupancy of the home at the time of the tax sale, and the auction receipt specifically stated that personal property within the home was not being sold.

The *Ritchie* Court also considered whether the plaintiff should have been allowed to amend her complaint to add a claim for wrongful eviction. *Id.* at 4. This Court concluded that the plaintiff had not submitted any authority in support of her position because she had only cited the *Deroshia* case, dealing with a holdover tenant, when she was not a holdover tenant. *Id.* As explained earlier in this opinion, there was an adequate basis in the present case for a finding of a holdover tenancy.

Affirmed.

/s/ Michael F. Gadola
/s/ Sima G. Patel
/s/ Allie Greenleaf Maldonado