*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CITIZENS FOR HIGGINS LAKE LEGAL
LEVELS, ERIC OSTERGREN, STEVE
RICKETTS, GLENN R. FAUSZ, ROBERT
OBRYAN, DRU OBRYAN, and THOMAS
THOMSON, CAROL THOMSON, and JANICE
JAMESON, Individually and as Trustees of the
JANICE JAMESON TRUST,

   Plaintiffs/Petitioners-Appellants,

v

ROSCOMMON COUNTY BOARD OF
COMMISSIONERS,

   Defendant/Respondent-Appellee,

and

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, & ENERGY, ANNE MEEKS, RICHARD
MEEKS, DON CORRELL, VALERIE SMITH,
DEAN REUSSER, PHILIP WILL, KAREN WILL,
JULIE SMITH, GARY SMITH, STAN
GALEHOUSE, BARBARA GALEHOUSE, STEVE
BURNS, and DIANE BURNS,

   Intervening Defendants-Appellees.

FOR PUBLICATION
March 17, 2022
9:05 a.m.

No. 353969
Roscommon Circuit Court
LC No. 19-724711-AW

Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

CAVANAGH, P.J.

  In this dispute involving the water levels of Higgins Lake, plaintiffs appeal by right an order granting summary disposition in favor of defendant Roscommon County Board of

Commissioners (defendant), and denying plaintiffs' motion to dismiss intervening defendant Department of Environment, Great Lakes, and Energy (EGLE) as a party for lack of subject-matter jurisdiction over any claims against EGLE. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

Plaintiff Citizens for Higgins Lake Legal Levels "is a domestic nonprofit corporation whose purpose and existence are to promote and defend the legal lake levels on Higgins Lake." The remaining plaintiffs are those who own, inhabit, use, or have access to land that abuts Higgins Lake. For ease of reference, we will refer to the entity and various individual plaintiffs collectively as "plaintiffs." In 1982, the Roscommon Circuit Court established the legal lake levels for Higgins Lake to be 1,154.11 feet in the summer months and to be 1,153.61 feet during the winter months. The parties do not dispute this. The 1982 order also provided:

> [I]n adjusting the lake levels as herein provided, the person or persons responsible for such operations shall make every reasonable effort to take into consideration stream flows into the lake and projected snow melt runoff within the water shed, as well as providing a minimum release during refill operations.

Plaintiffs alleged that, for several years, defendant failed to "employ known best practices and available technology" to maintain Higgins Lake at its court-mandated levels for "each and every day of the summer time period." Plaintiffs pointed to data from the "United States Geological Survey" of Higgins Lake for support, which showed that lake levels in the summer months were below the court-ordered levels "two-thirds (2/3) of the time in 2016, over one quarter (1/4) of the time in 2017, and nearly ninety percent (90%) of the time in 2018." Plaintiffs claimed that defendant was intentionally causing the reduced lake levels by not "utilizing all known reasonable practices and available technology." Plaintiffs alleged that each of them had "suffered adverse, negative, and loss-causing effects," which plaintiffs described as the inability "to enjoy the full extent of recreational and water-based activities" because of defendant's failure to maintain the proper lake levels.

Plaintiffs sought a writ of mandamus based on the claim that defendant "has the clear legal duty . . . to maintain or have its delegated authority maintain the lake level of Higgins Lake during the summer months at 1154.11 feet above mean sea level" and that defendant had breached this duty. As the basis for defendant's clear legal duty and violation of that duty, plaintiffs pointed to two statutory sections under the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*: first, MCL 324.30702(3), which provides that, "[i]f a court-determined normal level is established pursuant to this part, the delegated authority of the county or counties in which the lake is located shall maintain that normal level;" and second, MCL 324.30708(1), which provides that, "[a]fter the court determines the normal level of an inland lake in a proceeding

initiated by the county, the delegated authority of any county or counties in which the inland lake is located shall provide for and maintain that normal level."[1]

Attached to plaintiffs' complaint and petition was a "Higgins Lake Level Control Structure 2010 Engineering Report" from "Spicer Group." Spicer Group was commissioned by defendant to analyze the "Higgins Lake Level Control Structure (LCS)," and recommended that its "report should be adopted as a guideline for the County related to needed improvements, maintenance and operational changes for the Higgins Lake LCS." The LCS was described as a structure that "regulates flow leaving Higgins Lake to the Cut River."

A permit from the then-Department of Environmental Quality, now EGLE, was issued in 2007 for the LCS. The permit provided that it did "not eliminate managing Higgins Lake and the Cut River in accordance with the Court Ordered Lake Level. Minimum and maximum flows must be maintained in the Cut River as necessary to prevent harm to the aquatic ecosystem."

The Spicer Group's overall conclusion was

that the Higgins Lake LCS has adequate hydraulic capacity during large runoff events. However, discharge from the lake is limited by the capacity of the Cut River. Additionally, this study has found that the level of Higgins Lake has averaged below the court established legal lake level during the summer months in typical years. Factors such as water loss due to evaporation, wave action and flow through an unregulated low flow channel contribute to the low summer levels. Losses due to evaporation have been calculated to be the most substantial factor followed by flow through the unregulated span and then by losses due to wave action.

The Spicer Group examined data on lake levels and found that, between "1986 to 2009, the lake level has averaged 0.1 feet above the legal level to 0.3 feet below the legal level during summer months." The Spicer Group found that, in 2007, the LCS

was altered to include two additional tilting weir gates (also referred to as "flop gates") totaling 33 feet in length and an unregulated low-flow channel measuring roughly 4.75 feet in width. Through comparison of historical data, the average lake level was found to have been lower in the period following these alterations than the period prior. This does not appear to be attributable to a drought as precipitation in the years immediately following the structure's alteration has been well above average. Therefore, if legal levels are to be maintained annually, water levels must exceed the legal level in the early summer months to conserve an adequate volume to maintain the legal level through the later summer months.

---

[1] The Inland Lake Level Act of 1961, MCL 281.61 *et seq.*, was repealed by 1994 PA 451, § 90103, and reenacted as Part 307 of the NREPA by 1995 PA 59, § 1, without substantive change. See *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 386 n 7; 651 NW2d 756 (2002).

This process of raising water levels in the early summer months is apparently referred to as water banking. The Spicer Group examined data on lake levels and found that, after the 2007 modification of the LCS, "the average lake level has decreased by 0.1 to 0.4 feet relative with the periods prior to the modification." The Spicer Group recommended that

> [a]lterations are needed to improve LCS operation to enable lake levels to be maintained closer to the legal level. Specifically, a restrictor should be placed in the low flow channel to reduce the amount of flow to the Cut River in late summer. Also, scour protection should be added to the low flow channel, improvements should be made to the sheet piling portions and improvements should be made to the stop logs. Also, the staff gage should be replaced.

According to the Spicer Group, the LCS modification in 2007 caused "the amount of water leaving the LCS during summer months . . . to increase by roughly 30 percent over the losses due to evaporation and wave action alone." Moreover, in the prior three years, the levels of the lake had decreased annually by an average of 0.20 feet.

Relevant to this appeal, plaintiffs requested that the trial court issue a writ of mandamus directing defendant "to meet its legal obligation to keep and maintain" Higgins Lake water levels in accordance with the 1982 order, and ordering defendant "to implement the Spicer Group's recommendations and/or establish guidance and operational practices for the devices used to control the lake level of Higgins Lake."

A joint ecohydrological evaluation of Higgins Lake in the mid-2010s evaluated the effect that removing the LCS would have on the ecosystems of Higgins Lake and the Cut River. The evaluation concluded "that lake level management does not have significant effects on fishery habitat in Higgins Lake but does have significant effects on shoreline erosion. Lake-level manipulations have significant effects on fisheries habitat in the Cut River." The evaluation provided that

> [t]he probability of achieving the established summer lake level (1154.11 feet) is 15% under current operation and 0% for the unmanaged dam scenarios (Table 2). The probability of achieving an established summer lake level 100% of the time under current operation would occur at 1153.28 feet (SLL-10), and at lower levels (1152.92, SLL-14.3) for the unmanaged dam scenarios.

Additionally, the evaluation provided

> that flows of 100-150 cfs are necessary to provide optimal habitat for fish in the Cut River (Figure 5). Flows of 50 cfs are a target flow rate to protect Cut River fisheries and cannot be achieved when all dam gates are closed (Figure 6). Flows of 50 cfs during summer have a much greater likelihood of occurring in the unmanaged dam scenarios (No dam and Gates 4-6 open, Table 2). A summer flow of 33 cfs is likely to be exceeded 95% of the time under natural conditions, 90% of the time with Gates 4-6 open, and 63% of the time under current operation. Note that with the 4.75 ft low flow opening in the dam, Cut River flows are lower than recommended under current operation. Presently, the low flow opening is not large enough to consistently provide even 33 cfs (the 95% natural flow).

-4-

Alisha Pastell had served as "Board Secretary for the Roscommon County Board of Commissioners and as the Accounts Payable Clerk for Roscommon County." Part of her duties was to "compile and keep the records of a daily log of the Higgins Lake Level Control Structure." These logs were attached to her affidavit, and their dates were from April to November in the years of 2016, 2017, 2018, and 2019. The logs showed either a "C" or "O" to represent that a gate was either "closed" or "opened," respectively. These logs demonstrate that, for the vast majority of the time between April and November, the gates were closed.

## A. EGLE'S MOTION TO INTERVENE

EGLE moved to intervene, arguing that it had "a right to intervene . . . because it is designated by statute as an interested party who must be given notice and an opportunity to intervene in any inland lake level proceedings under" the NREPA. Although EGLE conceded that plaintiffs' action was not "a proceeding to establish a normal lake level," it contended that its "statutory right to participate should apply" because plaintiffs' action "is an action brought to enforce the order resulting from" a proceeding to establish a lake level. Alternatively, EGLE argued that "permissive intervention" was appropriate because it was the state agency "charged with administering Michigan's inland lake levels statute" and had "an interest in ensuring that normal lake levels . . . are maintained appropriately, and that court orders [establishing lake levels] . . . are enforced appropriately." Further, EGLE contended that part of plaintiffs requested relief, the alteration of the LCS, was "expressly forbidden by an EGLE permit" and that "any new lake level control measures that the Court might order as a result of this litigation would likely require EGLE permits prior to implementation."

At the motion hearing, plaintiffs argued against EGLE's intervention, reasoning that plaintiffs had no claim against EGLE; instead, plaintiffs' claim was against defendant. The trial court granted EGLE's motion to intervene. The trial court reasoned that intervention was proper because EGLE had an interest in any lake level, and prior court orders establishing lake levels, that was not adequately represented by defendant. Although similar, the trial court stated that EGLE's interest was "a little bit different than Roscommon County's position," especially "as it impacts on the Cut River Dam and the channel and banking of water."

## B. PLAINTIFFS' MOTION TO DISMISS EGLE

Subsequently, plaintiffs filed a motion to dismiss EGLE for lack of subject-matter jurisdiction. Plaintiffs argued that EGLE was "mis-joined" and must be dismissed because plaintiffs' claims were against defendant and not EGLE. Additionally, plaintiffs contended that the trial court lacked subject-matter jurisdiction with respect to EGLE because only the Court of Claims could exercise jurisdiction over a claim involving EGLE. The trial court denied the motion, holding that EGLE had an interest in this case and the Court of Claims Act was not applicable under the facts of this case.

## C. DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

Relevant to this appeal, defendant filed a motion for summary disposition under MCR 2.116(C)(8) and (10). Defendant first contended that the primary question was its duty owed to plaintiffs and the answer to this question was to be found in the 1982 order. Defendant argued that

Michigan law did not require it to maintain lake levels at a minimum or maximum level; rather, defendant was to maintain the legal lake level in accordance with seasonal changes and the weather. Accordingly, defendant contended that plaintiffs' position necessarily failed because there was no duty to maintain the exact legal level on a daily basis and, by extension, no breach for slight variations in the lake level on a daily basis.

Defendant also argued that the Spicer Group's recommendations addressed discretionary maintenance practices and were not ministerial; therefore, the writ of mandamus was precluded. Further, defendant contended that it did not have to comply with a lake level order if that meant noncompliance with state permit requirements. Defendant believed that, if it "has any duty regarding the [LCS], it is to leave the low-flow channel undisturbed." And, defendant argued, plaintiffs had alternative remedies available which further precluded the writ of mandamus. Moreover, plaintiffs' request for water banking "effectively seeks a determination of a new higher seasonal level," and the proper course of action for plaintiffs was to petition defendant for this new level. Finally, defendant contended that the logs showed that it had complied with the 1982 order and relevant Michigan law.

Plaintiffs opposed defendant's motion for summary disposition. Regarding MCR 2.116(C)(8), plaintiffs argued that "[a]ll the elements of the mandamus claim have been pled and support [sic] by facts." Regarding MCR 2.116(C)(10), plaintiffs contended that the issue was not defendant's duty because that was clear and undisputed: defendant had a duty to maintain the court-mandated legal level. Instead, plaintiffs argued that the issue was whether defendant had breached this duty, which was a question of fact for the trier of fact to decide. Plaintiffs contended that defendant's duty to maintain the legal level was ministerial, not discretionary.

The trial court granted defendant's motion under both MCR 2.116(C)(8) and (10). The trial court's ruling was primarily focused on MCR 2.116(C)(8). The trial court referenced the 1982 order and noted that "there is a discretionary component built . . . into the court order" via the language "shall make every reasonable effort to take into consideration stream flows into the lake and projected snow melts, runoff in the watershed as well as providing a minimum release during refill operations." The trial court referenced the ecohydrological evaluation and found that it "suggests that the normal legal level at least during the summer months . . . is potentially not realistic under the current dam limitations no matter who is responsible for its operation. It also suggests that the legal level . . . if anything is potentially too high without modification to the dam to maintain that level."

The trial court stated that it needed to determine the scope of defendant's legal duty and whether plaintiffs had a clear legal right to performance of such duty. To this end, the trial court stated that it needed to examine defendant's actions regarding the "gate of the dam" and whether it was closed or opened; this could be examined via the logs. The trial court stated that these logs showed, "as an example, that all gates and boards at the dam had been closed as of June 4, 2018 and remained closed through October 31, 2018." The trial court stated that, despite doing this, the lake levels during this period were below the legal limit. According to the trial court, plaintiffs had failed both in their complaint "or any of the other information the Court read in the documents to suggest [defendant] did anything to cause that as an intentional act."

The trial court discussed the legal principles and stated:

-6-

The Act says that . . . they shall provide for and maintain that normal level, that they need to inspect the dam and make repairs as necessary. The Inland Lake Act does not define normal lake level to include a minimum or a maximum. Also, there is no legal authority to support the notion that any deviation from a normal lake level is illegal and a breach of duty per se. If that . . . is spelled out in the statute, I couldn't find it.

The trial court referenced caselaw in which this Court held that a "lake level order establishes a normal level subject to seasonal variation and precipitation" and that fluctuations were not a breach. The trial court rejected plaintiffs' argument that defendant breached its clear legal duty whenever the lake's levels went below the legal level:

[A]s the reports the Court has studied as part of this action and as the studies themselves suggest, that is all but impossible task [sic] given the current . . . state of the dam and accounting for evaporation, precipitation, wave action . . . and water action on the shoreline. The 1982 lake level order does not require this heightened duty for daily compliance with that level. If it does, I . . . didn't find it in the order and I don't find it in the Inland Lakes Act either.

The trial court summarized defendant's duty as maintaining the legal level "subject to the laws of nature and the limitations of the dam." The legal level was "not a minimum or a maximum level nor is it a level that can be expected to be hit on exactly on a daily basis due to the laws of nature and the limitations and functioning of the current dam structure." Moreover, the trial court stated that defendant had "a duty to maintain the dam and comply with the state permitting requirements."

The trial court stated that neither the 1982 order nor applicable law required defendant to adopt "suggestions as to managerial approaches" or else be in breach of its duty. With no contrary authority presented, the trial court held that defendant had "no legal obligation to adopt the findings of the Spicer Report while ignoring the findings of the . . . ecohydrological evaluation . . . ." Instead, the trial court concluded that both studies addressed "discretionary practices and not ministerial as mandamus actions require." The trial court pointed to the 1982 order, which included no language requiring defendant to bank water or do anything else recommended by the Spicer Group. Given that these were discretionary actions, plaintiffs could not compel defendant with a writ of mandamus. Moreover, the trial court summarily mentioned that to force defendant to adopt the Spicer Group's recommendations would be "a clear violation of the separation of powers clause."

Additionally, the trial court noted that banking water would raise lake levels above the legal level; accordingly, the trial court was concerned with "why is it the case that if the level of the lake is below the legal level, a breach automatically occurs" but, if banking water was above the legal level, no breach would occur. Moreover, restricting the LCS would lead "to a possible misdemeanor and fine." The trial court noted that the 1982 order required defendant to maintain the water levels both above and below the legal level. The trial court further stated that plaintiffs' alleged harm, if taken as true, was not "contemplated by the Inland Lake Act or the 1982 order" because it was merely recreational harm. The trial court stated that plaintiffs had other remedies available, such as petitioning for a change in the lake level. Therefore, the trial court ruled that plaintiffs had failed to state a claim under MCR 2.116(C)(8).

Plaintiffs' attorney asked for clarification because "you also utilized records that would be outside the pleadings as part of your fact recitation." Plaintiffs' attorney stated that, if the trial court "has a rationale under (C)(10) as well it sounds like it would be helpful." The trial court agreed and stated, similar to its ruling under MCR 2.116(C)(8), that, due to the "impossibility" of maintaining the exact legal level, there was no genuine issue of material fact regarding defendant's duty and the alleged breach of that duty. The trial court noted the Spicer Group's conclusions and recommendations, which plaintiffs asked the trial court to adopt, were not in dispute. Accordingly, the trial court ruled that there was no "need for further discovery on those points." Finally, the trial court stated that the other motions and issues were moot and declined to address them. This appeal followed.

## II. ANALYSIS

### A. DISMISSAL OF DEFENDANT

Plaintiffs argue that the trial court erred in granting defendant's motion for summary disposition under MCR 2.116(C)(8) and (10). We agree.

"This Court reviews de novo a trial court's decision on a motion for summary disposition, as well as questions of statutory interpretation and the construction and application of court rules." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion is properly granted under MCR 2.116(C)(8) when the opposing party fails to state a claim upon which relief can be granted. Such a motion "tests the legal sufficiency of the claim on the basis of the pleadings alone . . . ." *Bailey v Schaaf*, 494 Mich 595, 603; 835 NW2d 413 (2013). When reviewing the motion, "the court must accept as true all factual allegations contained in the complaint." *Id*. The trial court must grant the motion "if no factual development could justify the plaintiff's claim for relief." *Id*. (quotation marks and citation omitted).

A motion is properly granted under MCR 2.116(C)(10) when "there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law." *Dextrom*, 287 Mich App at 415. This Court "must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Id*. at 415-416. "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). Questions of statutory interpretation are reviewed de novo. *Dextrom*, 287 Mich App at 416. "Interpreting the meaning of a court order involves questions of law that we review de novo on appeal." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 460; 750 NW2d 615 (2008).

Questions of law are reviewed de novo. *Christenson v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354037); slip op at 3. Similarly, a decision "whether defendants have a clear legal duty to perform and whether plaintiff has a clear legal right to performance of any such duty" is reviewed de novo. *Id*. at ___; slip op at 3. In contrast, the trial court's decision whether to issue a writ of mandamus is reviewed for an abuse of discretion. *Younkin v Zimmer*, 497 Mich 7, 9; 857 NW2d 244 (2014); *Berry v Garrett*, 316 Mich App 37, 41;

890 NW2d 882 (2016). A court abuses its discretion when its decision "is outside the range of reasonable and principled outcomes." *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

The arguments on appeal are relatively straightforward. Plaintiffs contend that defendant has a clear legal duty to maintain the lake levels during the summer months at the legally set level of 1,154.11 feet. According to plaintiffs, defendant cannot deviate from this level and must work to maintain it at that specific level. Given that defendant failed to do so for a number of years, it was in violation of its clear legal duty, which warranted the writ of mandamus. Summary disposition was, therefore, improper. On the other hand, defendant argues that it does not have a clear legal duty to strictly maintain the 1,154.11-foot level and that deviations are permissible. Accordingly, there was no clear legal duty or breach of that duty. Additionally, defendant argues that plaintiffs failed to show a ministerial duty because the method of maintaining the lake level is left to defendant's discretion. Therefore, the writ of mandamus failed, and summary disposition was proper. We agree with plaintiffs.

"[M]andamus is an extraordinary remedy and it will not lie to review or control the exercise of discretion vested in a public official or administrative body." *Morales v Mich Parole Bd*, 260 Mich App 29, 41-42; 676 NW2d 221 (2003). Recently, this Court provided the relevant legal framework for writs of mandamus:

> To obtain the extraordinary remedy of a writ of mandamus, the plaintiff must show that (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result. In relation to a request for mandamus, a clear, legal right is one clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided. [*Christenson*, ___Mich App at ___; slip op at 4, quoting *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 518; 866 NW2d 817 (2014).]

"A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Berry*, 316 Mich App at 41 (quotation marks and citation omitted).

MCL 324.30708(1) provides: "After the court determines the normal level of an inland lake in a proceeding initiated by the county, the delegated authority of any county or counties in which the inland lake is located shall provide for and maintain that normal level." Similarly, MCL 324.30702(3) provides: "If a court-determined normal level is established pursuant to this part, the delegated authority of the county or counties in which the lake is located shall maintain that normal level." MCL 324.30701(h) defines "normal level" as follows:

> "Normal level" means the level or levels of the water of an inland lake that provide the most benefit to the public; that best protect the public health, safety, and welfare; that best preserve the natural resources of the state; and that best preserve and protect the value of property around the lake. A normal level shall be measured and described as an elevation based on national geodetic vertical datum.

Here, in 1982 the circuit court entered an order establishing the normal lake levels for Higgins Lake to be 1,154.11 feet in the summer months and to be 1,153.61 feet during the winter months. The parties do not dispute this. Specifically, the 1982 order stated, in relevant part:

> This cause having come on to be heard on the Petition to Establish Water Level of Houghton Lake, Higgins Lake and Lake St. Helen, heretofore filed in this cause on behalf of the Roscommon County Board of Commissioners; it appearing that proper notice was given to interested parties; this having heard testimony of [sic] behalf of the Michigan Department of Natural Resources and interested persons appearing at the public hearing on said petition; it appearing that the following order will provide the most benefit to the public and best protect the natural resources of the state, and preserve and protect the values of property developed around said lakes; and the Court being fully advised in the premises:

> IT IS HEREBY ORDERED AND ADJUDGED that the legal level of Higgins Lake, Roscommon County, Michigan, heretofore established at 1154.11 feet above mean sea level, be continued; provided, however, that said level be lowered to a level not less than 1153.61 feet, commencing on or about November 1 of each year, and restored to its legal level, commencing on or about April 15, or ice-out, which ever shall first occur, in each year.

> * * *

> IT IS FURTHER ORDERED AND ADJUDGED that, in adjusting the lake levels as herein provided, the person or persons responsible for such operations shall make every reasonable effort to take into consideration stream flows into the lake and projected snow melt runoff within the water shed, as well as providing a minimum release during refill operations.

Plaintiffs filed this case seeking enforcement of the normal lake levels already established by the circuit court and memorialized in a court order, and so, invoked the circuit court's continuing jurisdiction over the matter. See MCL 324.30707(5); see also *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 531; 695 NW2d 508 (2004). This is not a case challenging or objecting to the normal lake levels as already determined by the circuit court: this is a case seeking enforcement of the court's order. Accordingly, defendant's reliance on the case of *In re Van Ettan Lake*, 149 Mich App 517; 386 NW2d 572 (1986), in support of its arguments is misplaced. That case involved a court's determination of an inland lake's normal level, and not the enforcement of the normal level that has already been established by court order. *Id.* at 519-520.

The rules of statutory construction are well established. "When interpreting a statute, [this Court] must ascertain the Legislature's intent," which is accomplished "by giving the words selected by the Legislature their plain and ordinary meanings, and by enforcing the statute as written." *Griffin v Griffin*, 323 Mich App 110, 120; 916 NW2d 292 (2018) (quotation marks and citation omitted). If a statute is unambiguous, it must be applied as plainly written. *McQueer v Perfect Fence Co*, 502 Mich 276, 286; 917 NW2d 584 (2018). This Court may not read something into the statute "that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id.* (quotation marks and citation omitted). And it has long been understood

-10-

that the use of the word "shall" means mandatory. *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 612; 321 NW2d 668 (1982); *State Hwy Comm v Vanderkloot*, 392 Mich 159, 180; 220 NW2d 416 (1974).

MCL 324.30708(1) and MCL 324.30702(3) are clear and unambiguous: once a court has determined the "normal level" of an inland lake, it "shall" be maintained at that "normal level" by the responsible authority—here, defendant. This meets the requirement for a clear, legal duty to support a mandamus action in that it is clearly established by a statute. See *Christenson*, ___ Mich App at ___; slip op at 4. And this conclusion is consistent with this Court's holding in *Anson v Barry Co Drain Comm'r*, 210 Mich App 322; 533 NW2d 19 (1995). In that case, this Court held that a court order establishing the normal level of an inland lake remains in effect and must be enforced as written unless the proper proceedings are conducted and there is a determination that a departure from the established normal level is necessary considering the welfare and benefit of the public. *Id*. at 325-327; see also MCL 324.30707(5). As made clear in *Glen Lake-Crystal River Watershed Riparians*, 264 Mich App at 537, the focus of the court in determining the normal lake level is "environmental and recreational." And thus, in establishing the normal level, a court "may determine that the normal level shall vary seasonally," MCL 324.30707(5). In the case before us, the court accounted for seasonal fluctuation by setting the normal level at 1,154.11 feet in the summer months and 1,153.61 during the winter months.

We conclude, then, that the 1,154.11-foot level established in the 1982 court order was the lake level that defendant was required to maintain in the summer months. This, by extension, supports plaintiffs' position that defendant has a clear legal duty to maintain the 1,154.11-foot level and that, by failing to do so for several years, it has violated that duty. If this level is impossible or no longer beneficial to the public, the proper course of action was for defendant to petition the circuit court for a departure from the 1,154.11-foot level. See *Glen Lake-Crystal River Watershed Riparians*, 264 Mich App at 537; *Anson*, 210 Mich App at 325-327. But deviations from the court-established level must be explicitly permitted by the court after proper proceedings.

We disagree with the trial court that the 1982 court order had "a discretionary component built . . . into" it. The order language that the trial court referenced was:

> [I]n adjusting the lake levels as herein provided, the person or persons responsible for such operations shall make every reasonable effort to take into consideration stream flows into the lake and projected snow melt runoff within the water shed, as well as providing a minimum release during refill operations.

This language does not explicitly allow for deviations. The 1982 court order merely references stream flows and snow melt runoff and mandates that defendant take these into consideration. The 1982 court order sets the legal levels and no explicit deviation or fluctuation was permitted. The trial court summarized defendant's duty as maintaining the legal level "subject to the laws of nature and the limitations of the dam." But this holding—and defendant's claim that it is not required to maintain the level at 1,154.11 feet in the summer—renders the 1982 court order meaningless and reads in language that is not present in that order. Caselaw, as well as the mandatory statutory language, does not support reading in these limitations. And plaintiffs did not claim that a single deviation occurred; rather, plaintiffs alleged, and the Spicer Group's report demonstrates, that the deviation has been perpetual and consistent across many years. The first two elements for a writ of mandamus are, therefore, met. See *Christenson*, ___ Mich App at ___; slip op at 4.

-11-

Defendant also contends that plaintiffs have failed to satisfy the third requirement for a writ of mandamus because there is no ministerial duty. Although MCL 324.30708(1) uses mandatory language to describe the duty to maintain the lake levels, the remaining part of the statute uses permissive language when describing *how* to maintain the lake levels. See MCL 324.30708(2) and (3) (using the word "may" instead of "shall" to describe the various ways of maintaining the lake level). This suggests that the method of maintaining the lake level is left to the applicable authority's discretion. Accordingly, it appears that plaintiffs have no say in how to bring the lake levels in compliance with the 1982 court order. This is left to defendant's discretion, and plaintiffs, therefore, cannot compel defendant, through a writ of mandamus, to adopt the recommendations of the Spicer Group, which was one of the requested remedies in plaintiffs' petition. See *Berry*, 316 Mich App at 42 (describing a ministerial act as one that leaves nothing to discretion or judgment).

However, this does not, as defendant argues, defeat the writ of mandamus. Defendant and the trial court mistakenly confused what duty to examine. Plaintiffs asked the trial court to compel defendant to comply with its legal duty of maintaining the legal lake level at 1,154.11 feet. Accordingly, the applicable duty was not how defendant had chosen to maintain this level; rather, the applicable duty was the duty to *maintain* the lake at this level. The method of maintaining the lake level is discretionary, but defendant has a ministerial duty to maintain the lake level. To accept the position of defendant and the trial court would leave plaintiffs, and other similarly situated parties, without any way to obtain a writ of mandamus. A defendant could essentially always defeat petitions for such writs on the basis that the method is discretionary and not ministerial. This would have the effect of rendering MCL 324.30708(1)'s mandatory language meaningless because a defendant would be free to ignore court-established lake levels.

Finally, plaintiffs met the fourth element for a writ of mandamus: no other adequate legal remedy exists to achieve the same result. See *Christenson*, ___ Mich App at ___; slip op at 4. Defendant argues, and the trial court agreed, that the proper remedy and course of action was for plaintiffs to petition the trial court to change the lake level. We do not agree. A writ of mandamus to compel compliance with a previously established lake level is the proper course of action. Most importantly, plaintiffs are clearly not attempting to *change* the level; rather, they are attempting to compel defendant to *maintain* the level at 1,154.11 feet, which has been the court-ordered legal level since 1982.

Therefore, summary disposition under MCR 2.116(C)(8) was improper because plaintiffs successfully stated a claim upon which relief could be granted. Taken as true, plaintiffs' complaint and petition adequately pleaded the elements for a writ of mandamus. Defendant had a clear, legal duty to maintain the lake level at 1,154.11 feet; plaintiffs had a right to performance of this duty; this duty was ministerial and not discretionary; and no adequate, alternative remedy exists.

For the same reasons, summary disposition was improper under MCR 2.116(C)(10). The Spicer Group concluded that the lake levels over the course of several years had been below 1,154.11 feet, and defendant did not dispute this or provide evidence to the contrary. Rather, defendant's position was that it was not required to maintain the 1,154.11-foot level and could freely deviate from this court-ordered level. Defendant has provided no legal authority to support its claim that it was not bound to strictly follow the dictates of the court order. Defendant also contended that it was impossible to maintain this level and that to do so would violate the LCS

permit and affect the Cut River. However, the EGLE permit expressly states: "This permit does not eliminate managing Higgins Lake and the Cut River in accordance with the Court Ordered Lake Level." If defendant claims that it cannot maintain 1,154.11 feet reliably, that to do so is no longer beneficial to the public, or that it would violate the permit from EGLE, then defendant must raise any such issue in a proper legal proceeding. Defendant may not, however, ignore or disregard the established court-determined normal level set forth in the 1982 order. As in *Anson*, "the statute does not grant courts the authority to simply abolish a prior determination of the normal lake level," nor does it "authorize a departure from the established lake level without a showing that that level is no longer beneficial." *Anson*, 210 Mich App at 326.

Accordingly, the trial court erred by granting summary disposition in favor of defendant under MCR 2.116(C)(8) and (10).

## B. DISMISSAL OF EGLE

Plaintiffs also argue that the trial court erred by refusing to dismiss EGLE for lack of subject-matter jurisdiction. We disagree.

"Whether a court has subject-matter jurisdiction presents a question of law that this Court reviews de novo." *Reynolds v Robert Hasbany MD PLLC*, 323 Mich App 426, 431; 917 NW2d 715 (2018). Questions of statutory interpretation are reviewed de novo. *Dextrom*, 287 Mich App at 416.

"[T]he circuit court is presumed to have subject-matter jurisdiction over a civil action unless Michigan's Constitution or a statute expressly prohibits it from exercising jurisdiction or gives to another court exclusive jurisdiction over the subject matter of the suit." *O'Connell v Dir of Elections*, 316 Mich App 91, 101; 891 NW2d 240 (2016) (quotation marks and citation omitted). Relevant to this appeal, the Court of Claims has authority

> [t]o hear and determine any claim or demand, statutory or constitutional, liquidated or unliquidated, ex contractu or ex delicto, or any demand for monetary, equitable, or declaratory relief or any demand for an extraordinary writ against the state or any of its departments or officers notwithstanding another law that confers jurisdiction of the case in the circuit court. [MCL 600.6419(1)(a).]

This authority includes writs of mandamus against the state and its departments or officers. *O'Connell*, 316 Mich App at 103-104. The Court of Claims' jurisdiction, given by statute, "is exclusive." MCL 600.6419(1). "A court's subject-matter jurisdiction is determined only by reference to the allegations listed in the complaint. If it is apparent from the allegations that the matter alleged is within the class of cases with regard to which the court has the power to act, then subject-matter jurisdiction exists." *Reynolds*, 323 Mich App at 431 (quotation marks and citation omitted).

Plaintiffs' sole argument is based on MCL 600.6419(1)(a); however, by its plain language, this statutory section applies only to an action for an "extraordinary writ *against* the state or any of its departments or officers." The present case does not involve an action for an extraordinary writ against EGLE; rather, plaintiffs seek a writ of mandamus against defendant. EGLE merely intervened. Although plaintiffs cite *O'Connell* in support, it offers none. The plaintiff in

*O'Connell* petitioned for a writ of mandamus *against* the state, a department, or officer, because his application to run for reelection was rejected. See *O'Connell*, 316 Mich App at 94-96. Therefore, *O'Connell* is dissimilar to the present case. Plaintiffs provide no authority to support their proposition that EGLE is consenting to be sued by intervening in this matter and that the action for writ of mandamus is therefore *against* it. "An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims." *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 695; 880 NW2d 269 (2015) (quotation marks and citation omitted). When "a party fails to cite any supporting legal authority for its position, the issue is deemed abandoned." *Id*. (quotation marks and citation omitted).

Regardless, MCL 14.101 gives the attorney general the power "to intervene in any action heretofore or hereafter commenced in any court of the state whenever such intervention is necessary in order to protect any right or interest of the state, or of the people of the state." EGLE clearly has an interest at stake in this case. Moreover, MCL 324.30701(g) explicitly defines an "interested person" to include EGLE. And, as previously discussed, this case involves a permit issued by EGLE for the LCS that could be affected by the trial court's decision. Finally, such interventions have occurred in the past in cases involving lake levels and lake structures. See, e.g., *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 385 n 5; 651 NW2d 756 (2002). Accordingly, plaintiffs have failed to show that the trial court erred by refusing to dismiss EGLE for lack of subject-matter jurisdiction.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Jane E. Markey
/s/ Deborah A. Servitto